Wendle V. Lehnerd, pro se
33276 N. Cherry Creek Rd.
Queen Creek, AZ 85142
(602) 295-6175

FILED ____ LODGED
____ RECEIVED ____ COPY

AUG 1 4 2014

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

# IN THE UNITED STATES DISTRICT COURT

# IN AND FOR THE DISTRICT OF ARIZONA

WENDLE V. LEHNERD,

        Plaintiff,

     vs.

E-LOAN, INC.,

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC,

THE BANK OF NEW YORK MELLON CORP., f/k/a The Bank of New York, as Trustee for the certificate holders of Cwalt, Inc., Alternative, Loan Trust 2005-63, Mortgage Pass-Through Certificates, Series 2005-63, John Does 1-100,

        Defendants

No. _____ CV-14-01811-PHX-SPL _____

**PETITION FOR
DECLARATORY RELIEF
TO QUIET TITLE,
A.R.S. § 12-1101**

Dated: the 14th day of August, 2014

     Wendle V. Lehnerd, hereafter *Plaintiff*, states as his cause of action against Defendants as follows.

## IDENTITY OF PARTIES AND LAND

    1. Plaintiff purchased residential property in Pinal County, Arizona, known and referred to as 33276 N. Cherry Creek Rd., Queen Creek, AZ 85142. More particularly, the legal description of this property is:

> THE VILLAGE AT SANTAN HEIGHTS PARCEL 5 LOT 104, SEC 12-3S-7E, 6601 SQ. FT 0.15AC, ACCORDING TO THE PLAT OF RECORD IN THE OFFICE OF THE COUNTY RECORDER OF PINAL COUNTY, ARIZONA, RECORDED IN CABINET D, SLIDE 48. PINAL CNTY PARCEL #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

1   Hereafter, this address and legal description as well as all improvements thereon shall be known and

2   referred to as *Plaintiff's Property*.

3       2.   **E-LOAN, INC**. is a Delaware corporation doing business at 9600 W. Bryn Mawr,

4   Rosemont, Illinois 60018. This company currently has active charter status with the secretary of

5   state of Delaware. It is a legal entity in this state. The E-LOAN, INC. registered agent is: The

6   Corporation Trust Company, 1209 Orange Street, Wilmington, DE  19801.

7       3.   **Mortgage Electronic Registration Systems, Inc.** [a/k/a *MERS*] is a Delaware

8   corporation with its principle place of business at 1818 Library Street, Suite 300, Reston, Virginia

9   20190.  Mortgage Electronic Registration Systems, Inc., hereafter referred to as *MERS*, operates a

10  MERS Registry.  MERS Identifier No. 100039610008644956 appears on Plaintiff's Deed of Trust

11  and serves as a link to this MERS Registry. The *MERS* registered agent is: The Corporation Trust

12  Company, 1209 Orange Street, Wilmington, DE  19801.  *MERS* is named on Plaintiff's Deed of

13  Trust as beneficiary, acting solely as nominee for **E-LOAN, INC**. and its successors and assigns in

14  interest.

15      4.   **The Bank of New York Mellon Corporation** [f/k/a *The Bank of New York, as Trustee*

16  *for the Certificateholders of Cwalt, Inc., Alternative Loan Trust 2005-63, Mortgage Pass-Through*

17  *Certificates, Series 2005-63*] a Delaware corporation, is a global financial services company

18  headquartered at One Wall Street, New York, New York 10286. The Bank of New York Mellon

19  Corporation's registered agent for service of process is: The Corporation Trust Company, 1209

20  Orange Street, Wilmington, DE  19801. Currently The Bank of New York Mellon Corporation

21  maintains that it owns the lender's interest in land and the lien against the Plaintiff's property.

22  Hereafter The Bank of New York Mellon Corporation may be referred to as **BNYM**.

23

24                           **JURISDICTION and VENUE**

25      5.   This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 for reasons set

26  forth below.

27      6.   Plaintiff's property is located in Pinal County, Arizona and the territorial boundaries of

28  this District Court embrace this county.

7.   Defendants **E-LOAN, INC.,** *MERS* and **BNYM** are Delaware corporations. The principle place of business for **E-LOAN, INC.** is in Rosemont, Illinois. The principle place of business for *MERS* is in Reston, Virginia. **BNYM** has its headquarters in New York, New York. Plaintiff is a citizen and resident of Arizona. There is diversity of jurisdiction between Plaintiff and these out of state corporations.

8.   Since Plaintiff is seeking to quiet title on Plaintiff's property for $298,156.19 the amount of the controversy exceeds $75,000.

9.   This is an *in rem* proceeding pursuant to Arizona Revised Statutes § 12-1101 directed against *Plaintiff's property*, situated within the boundaries of Pinal County, Arizona. By virtue of an *Adjustable Rate Note* and *Deed of Trust* dated July 23, 2005, Plaintiff acquired an *equitable interest* in the title. Plaintiff can live on this land and only the Plaintiff has the right to sell this home.

10.   All of these Defendants have recorded an interest in *Plaintiff's Property.*

## PERTINENT FACTS AND LAW

11.   On July 23, 2005, Plaintiff agreed to borrow $264,000.00 from E-LOAN, INC., secured by *Plaintiff's Property*. Two instruments were signed by Plaintiff on this date; (1) *Adjustable Rate Note*[75] [hereafter *Note*] between Plaintiff and E-LOAN, INC. and (2) *Deed of Trust* between Plaintiff and E-LOAN, INC. Since Plaintiff is the lone signatory, the Note and Deed of Trust are both bearer instruments.

### Pertinent Terms in Note and Applicable Law

12.   ¶ 1 of the Note states in pertinent part:

I understand that Lender may transfer this Note.  Lender or anyone who takes this Note by transfer and *who is entitled to receive payments under this Note is called the "Note Holder."*[76] [Emphasis added.]

13.   Arizona Title 47-Uniform Commercial Code

---

[75] *See* Plaintiff's Exhibit 1, Note;        [76] *See* Plaintiff's Exhibit 1, Note at ¶ 1.

A.R.S. § 47-3110(c) stipulates *how* a negotiable instrument may identify the person to whom it is made payable. In pertinent part, this statute states:

> C. *A person to whom an instrument is payable may be identified in any way,* including by name, identifying number, office or account number. For the purpose of determining the holder of an instrument, the following rules apply: [Emphasis added.]

14.   In the vernacular of the Uniform Commercial Code, Plaintiff's Note has been made payable to the *person entitled to receive* Plaintiff's payments.

15.   ¶ 7 (C) of Plaintiff's Note states in pertinent part:

(C) Notice of Default

> "If I am in default, *the Note Holder may send me a written notice* telling me that if I do not pay the overdue amount by a certain date, *the Note Holder may require me to pay immediately the full amount of Principal* that has not been paid and all the interest that I owe on that amount…" [Emphasis added]

16.   The substantive law governing enforcement of a negotiable instrument is set forth in A.R.S. § 47-3301 and states in pertinent part:

> "Person entitled to enforce" an instrument means the holder of the instrument, a nonholder in possession of the instrument who has the rights of a holder or a person not in possession of the instrument who is entitled to enforce the instrument pursuant to . . ."

17.   Paragraph 1 of Plaintiff's Note declares, "who takes this Note by transfer and who is entitled to receive payments under this Note is called the *Note Holder*." By stipulating that the Note Holder is the person entitled to Plaintiff's payment, this paragraph rejects "the holder of the instrument" of A.R.S. § 47-3301 and adopts instead, "*a nonholder who has the rights of a holder…*" of A.R.S. § 47-3301.

18.   ¶ 7 (C) stipulates that only the Note Holder can send out a Notice of Default. ¶ 1 and ¶ 7(C) of Plaintiff's Note reserve enforcement exclusively to the person [or persons] entitled to receive Plaintiff's payment. This person is the *Note Holder.* These terms are embedded as indelibly into the foundation document of this transaction as are the names of the parties and the amount being loaned.

19.   The unambiguous meaning of ¶ 1 and ¶ 7(C) of Plaintiff's Note state that only the party entitled to Plaintiff's payments can be the *Note Holder* and successor in interest to the Lender. From this factually incontrovertible premise, this legal corollary is self-evident. Since the *Note Holder* is the only party that can initiate a foreclosure proceeding, this act of enforcement can only be performed by the person [or persons] that are entitled to receive Plaintiff's payments.

20.   The only person that can exercise the power to sell clause in Arizona non-judicial foreclosure statute is the party entitled to the borrower's payments.

21.   For reasons which will become apparent after examining documents from the Securities and Exchange Commission search engine, the *person entitled to enforce* Plaintiff's Note within the meaning of A.R.S. § 47-3301 is in fact a group of people. The parties entitled to Plaintiff's payments are current holders of mortgage-backed certificates owning a pro rata share of Plaintiff's Note. Self-authenticating documents filed with the Securities and Exchange Commission declare this group to be the owners of these Notes *for all purposes whatsoever*.

### Pertinent Terms in Deed of Trust

22.   Mortgage Electronic Registration Systems, Inc. [MERS] is described as a *nominee* for **E-LOAN, INC.** and its successors in interest. Paragraph (E) for Deed of Trust [77] states:

> ¶ (E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is *acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary* under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2016, tel. (888) 679-MERS. [77]

23.   Although the Deed of Trust establishes MERS as the beneficiary, by its own self-imposed admission, MERS *is not* making any contribution worthy of this designation. Paragraph 2 of MERS's *Terms and Conditions* [78] states in pertinent part:

---

[77] *See* Plaintiff Exhibit 2, Deed of Trust, p.1.
[78] *See* Plaintiff Exhibit 4, MERS Terms and Conditions, p.1.

¶ **2.** The Member, at its own expense, shall promptly, or as soon as practicable, cause MERS to appear in the appropriate public records as the mortgagee of record with respect to each mortgage loan that the Member registers on the MERS® System (each, a "MERS Loan"). *MERS shall serve as mortgagee of record with respect to all MERS Loans solely as a nominee, in an administrative capacity, for the beneficial owner or owners thereof from time to time. MERS shall have no rights whatsoever to any payments made on account of MERS Loans, to any servicing rights related to MERS Loans, or to any mortgaged properties securing MERS Loans.* MERS agrees not to assert any rights (other than rights specified in the Governing Documents) with respect to MERS Loans or mortgaged properties. References herein to "mortgage(s)" and "mortgagee of record" shall include deed(s) of trust and beneficiary under a deed of trust and any other form of security instrument under applicable state law.

24.     MERS has ruled out any entitlement to Plaintiff's payments. This also means that MERS cannot qualify as the *Note Holder* under ¶ 1 of Plaintiff's Note.

25.     The role of MERS is further defined in a *Together With* Clause [79]:

TOGETHER WITH all the improvements now or hereafter erected on the property and all easements, all appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." *Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender* including, but not limited to, releasing and canceling this Security Instrument. [79]

26.     The inability of MERS to hold any interest greater than just legal title, which is no ownership interest whatsoever, is also affirmed in its own *Terms and Conditions* [80]. Paragraph 6 states in part:

The Companies and the Member agree that: (i) *the MERS® System is not a vehicle for creating or transferring beneficial interests in mortgage loans,* (ii) transfers of servicing interests reflected on the MERS® System are subject to the consent of the beneficial owner of the mortgage loans, [80]

---

[79] *See* Plaintiff Exhibit 2, Deed of Trust, p.2;
[80] *See* Plaintiff Exhibit 4, MERS Terms and Conditions, p.1.

27.  Under this Deed of Trust, the powers of the Lender are pervasive. This is declared in the *Transfer of Rights in Property*[81] clause:

> TRANSFER OF RIGHTS IN THE PROPERTY
> The beneficiary of this Security Instrument is MERS (*solely as nominee for Lender and Lender's successors and assigns*) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the COUNTY OF PINAL, ARIZONA. [81]

28.  In ¶ 22, titled *Acceleration Remedies*, Plaintiff's Deed of Trust[82] states:

> "... If the default is not cured on or before the date specified in the notice, *Lender at its option* may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence." [82] [Emphasis added]

29.  In ¶ 24, titled *Substitute Trustee,* Plaintiff's Deed of Trust[83] states:

> *Lender may*, for any reason or cause, from time to time remove Trustee and appoint a successor trustee to any trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.[83] [Emphasis added]

30.  In pertinent part, the *Transfer of Rights* paragraph "secures to Lender:

(i) the *repayment of the Loan, and. . .*(ii) performance of Borrower's covenants and agreements *under this security instrument.*" Under *Acceleration, Remedies,* only the *Lender at its option* can invoke the power of sale and pursue foreclosure. Only the *Lender* may enforce the note and pursue foreclosure. No other party but the Lender or their successor in interest is allowed to exercise this authority.

---

[81] *See* Plaintiff Exhibit 2, Deed of Trust, p.2.
[82] *See* Plaintiff Exhibit 2, Deed of Trust, ¶ 22 at p.8;
[83] *See* Plaintiff Exhibit 2, Deed of Trust, ¶ 24 at p.8;

31.  Under well-settled property law concepts, only a party with an *ownership interest in the note* can enforce the mortgage. The Restatement (Third) of Property, Mortgages § 5-4(c) states, "a mortgage may be enforced *only by,* or *on behalf of,* a person who is entitled to enforce the obligation the mortgage secures." *A mortgage servicer and MERS have no ownership interest in the note.*

### Sale to Alternative Loan Trust 2005-63

32.  Shortly after Plaintiff's loan was made, this Note and Deed of Trust were subjected to a series of rapid transfers and a succession of new beneficial owners, most of which took place on one single day. The purpose served by these transfers was to convert these debt instruments into a debt commodity suitable for serving as collateral for newly issued mortgage-backed securities. Plaintiff's Note and Deed of Trust became part of a pool of mortgages for a secured transaction listed on the Securities and Exchange Commission's EDGAR search engine under the title *Alternative Loan Trust 2005-63.*

33.  After these sales, Plaintiff's Note was bundled and sold to a trust called *Alternative Loan Trust 2005-63* [hereafter referred to as *Trust*]. The transfer of mortgages to this *Trust* is documented in a Trust Agreement, the *Pooling and Servicing Agreement (PSA).*[84] A special purpose vehicle used by Countrywide Home Loans, Inc. for bundling and transferring mortgages, called *CWALT, INC.* is the depositor of loans. This granting clause [85] states in pertinent part:

> **SECTION 2.01.  Conveyance of Mortgage Loans**
> (a) Each **Seller,** concurrently with the execution and delivery of this Agreement, hereby sells, transfers, assigns, sets over and otherwise conveys to the **Depositor,** without recourse, all its respective right, title and interest in and to the related Mortgage Loans, including all interest and principal received or receivable by such Seller,[85]

34.  After assigning all of its right, title and interest to Plaintiff's Note and Deed of Trust to this Trust, **E-LOAN, INC.** could no longer claim any entitlement to Plaintiff's payments. When **E-LOAN, INC.** lost its entitlement to these payments, it relinquished as well its right to be called the *Note Holder* on Plaintiff's Note and to be called the *Lender* on Plaintiff's Deed of Trust.

---

[84] *See* Plaintiff Exhibit 3, *Pooling and Servicing Agreement* (*PSA*), Dated October 1, 2005.
[85] *See* Plaintiff Exhibit 3, *PSA*, Section 2.01 on p.70 of 313 [indexed at top right corner]

35.  This Trust acts as an apparatus for converting mortgages into a debt commodity. Each mortgage has now been transferred to *Alternative Loan Trust 2005-63*.  Mortgage-backed securities are issued by this Trust and bonded to a pool of mortgages. When this is complete, mortgage-backed securities and their assigned pool of instruments become inseparable. This transformation is documented in the *Pooling and Servicing Agreement (PSA)*[86, 87]. Excerpts from the *PSA* have been made Plaintiff's Exhibit 3.

36.  This Trust is authorized to issue *pass-through securities*.[88] Cash must flow from the pool of mortgages directly to security holders on a pro rata basis.[89]

### Privity of Contract Established between Plaintiff and Investors

37.  In a *Persons Deemed Owners*[90] clause, the *PSA* states that Certificateholders [i.e. investors] own the beneficial interest in these instruments. This *Persons Deemed Owners* clause appears in every *pass-through securities* offering. This pass-through feature enables the trust to be tax exempt, since it owns nothing. This clause states:

> **Section 5.04.**   The Master Servicer, the Trustee and any agent of the Master Servicer or the Trustee may treat the Person in whose name any Certificate is registered as the owner of such Certificate for the purpose of receiving distributions as provided in this Agreement and for all other purposes whatsoever, and neither the Master Servicer, the Trustee nor any agent of the Master Servicer or the Trustee shall be affected by any notice to the contrary.[90]

38.  Statements made in a filing for the Securities and Exchange Commission are subject to the heightened standard imposed by the Sarbanes-Oxley Act of 2002[P.L. 107-204]. This Act makes signatories accountable for the accuracy of all information disclosed and subject to penalties ranging from being delisted to multimillion-dollar fines and imprisonment. This statement in the *Persons Deemed Owners* clause also runs against the interest of the maker.

---

[86] *See* Plaintiff Exhibit 3, *Pooling and Servicing Agreement (PSA)*, Dated October 1, 2005;
[87] *See* Plaintiff Exhibit 3, *PSA*, *Percentage Interest*, definitions, p.45 of 313.
[88] *See* 26 U.S.C. §§ 671 to 679 for Internal Revenue Service grantor trust rules.
[89]  *See* Plaintiff Exhibit 3, *PSA*, definition of *Percentage Interest*, p.45 of 313, confirming the pass-through structure of this Trust.
[90] *See* Plaintiff Exhibit 3, *PSA*, Section 5.04, p.153 of 313.

Statements running against the interest of the maker are extremely difficult to overcome. The guilty plea aspect of this statement, coupled with its presence in a filing before the Securities and Exchange Commission, makes this statement *worthy of belief.*

39.   This *Persons Deemed Owners* clause closes the loop opened in the first paragraph of Plaintiff's Note by identifying the persons entitled to receive Plaintiff's payments. Holders of mortgage-backed certificates owning a fractional share of Plaintiff's Note are entitled to these payments. Under grantor trust rules of the IRS for pass-through securities, money generated by assets held in this Trust estate can only be paid to these owners; and this arrangement cannot be altered.

40.   Because of their fractional ownership interests in Plaintiff's Note and Deed of Trust, privity of contract is established between these note holders [i.e. investors] and Plaintiff.[91] This new alignment is permanent. It cannot be disturbed.

41.   Certificateholders [i.e. investors] hold the only financial stake in Plaintiff's Note. They are the only parties benefited or injured by the outcome.

42.   Since holders of mortgage-backed securities are permanently entitled to Plaintiff's payments, these parties are also identified under the Uniform Commercial Code as the *Note Holder.* Pursuant to Arizona Title 47-Uniform Commercial Code, § 47-3110(C), Plaintiff's Note is payable to these investors and no one else. In accord with A.R.S. §47-3301, only investors can initiate an enforcement action.

43.   ¶ 22 of Plaintiff's Deed of Trust states that the *Lender at it option* may accelerate payment. Current holders of mortgage-backed certificates owning a pro rata share of Plaintiff's Note and Deed of Trust are exclusively entitled to enforce this instrument. These investors are the Lender's successor in interest.

44.   Under terms of the Note and Deed of Trust, the only parties entitled to issue a Notice of Default and require accelerated payments are holders of mortgage-backed certificates owning

---

[91] The term *privity of contract* refers to a contractual relationship existing initially between two parties, and how this covenant can be assigned to a new party, who then stands in place of and as the successor in interest to the original party.

fractional shares of Plaintiff's Note, collectively exceeding a majority of the ownership interests outstanding.

45.   Holders of mortgage-backed certificates owning pro rata shares of Plaintiff's loan are not disclosed at the Pinal County Recorder's Office. There is no document on file at this Recorder's Office, attesting to the fact that these beneficial owners authorized anyone to act on their behalf. The Lender's true successor in interest and the *real party in interest* at this time, has been excluded from the one place, where all ownership interests must necessarily be reflected.

**No Functioning Lender**

46.   Mortgage-backed certificates will not be issued in the name of each investor. Instead, Certificates are sent to *Depository Trust and Clearing Corporation* [hereafter Depository Trust]. Depository Trust provides centralized administrative services for funding sources and their recipients. Its mission is to route and connect a source of funds to each recipient. Depository Trust also has a pseudonym called *Cede & Co.* The **Pooling and Servicing Agreement (PSA)**[92] states:

> **Section 5.02 (e)** Except as provided below, the Book-Entry Certificates shall at all times remain *registered in the name of the Depository or its nominee and at all times*: (i) registration of the Certificates may not be transferred by the *Trustee* except to another Depository; (ii) the Depository shall maintain book-entry records with respect to the *Certificate Owners* and with respect to ownership and transfers of such Book-Entry Certificates;
>
> [From PSA, Definitions] *Depository*: The initial Depository shall be The Depository Trust Company, *the nominee of which is CEDE & Co., as the registered Holder of the Book-Entry Certificates.* The Depository shall at all times be a "clearing corporation" as defined in Section 8-102(a)(5) of the Uniform Commercial Code of the State of  New York;
>
> *Trustee:* The Bank of New York and its successors and, if a successor trustee is appointed under this Agreement, such successor.
>
> *Certificate Owner*: With respect to a Book-Entry Certificate, the Person who is the beneficial owner of such Book-Entry Certificate.

47.   Every mortgage-backed certificate will reflect *Cede & Co.* as owner of record, instead of these investors. Depository Trust in not just the passive recipient of mortgage-backed securities.

---

[92] *See* Plaintiff Exhibit 3, **PSA**, p.151 of 313, Section 5.02(e) and Definitions p. 27, 32 and 67 of 313.

Depository Trust is inserted between the Trustee Bank and investors. It acts as the investors' authorized representative, empowered to speak on behalf of all certificateholders.[93] The **PSA states:**

> **Section 5.02 (e)(v)** the Trustee shall deal with the Depository, Depository Participants and indirect participating firms as representatives of the Certificate Owners of the Book-Entry Certificates for purposes of exercising the rights of holders under this

48.   The rights of investors which can be exercise are restricted to just the rules and agreements of Depository Trust[94]:

> **Section 5.02 (e)(ii)** the Depository shall maintain book-entry records with respect to the Certificate Owners and with respect to ownership and transfers of such Book-Entry Certificates; (iii) ownership and transfers of registration of the Book-Entry Certificates on the books of the Depository shall be governed by applicable rules established by the Depository;[94]

49.   Investor names are not on ownership records. Investors are subordinated to a company [i.e. Depository Trust] that can be counted upon to behave in a submissive and accommodating manner. They have no right to communicate with anyone but Depository Trust, and then they may discuss rules relating to Depository Trust. Investors are systematically and methodically ostracized from playing any role whatsoever in mortgage-backed transactions. Investors are not even allowed to discover what is taking place. There is no functioning Lender.

### No Agency Relationship with Trustee Bank

50.   While there is vague allegiance expressed in this Trust Agreement / Pooling and Servicing Agreement (**PSA**) that The Bank of New York Mellon Trustee is to protect present and future Certificateholders' welfare, a framework has been established blocking all access and communication lines between investors and the Trustee.

The Latin phrase *generalia specialbus non derogant*[95] states the principle that specific contract terms always trump general contract terms. The following specific terms overrule these ambiguous and terms of protection.

---

[93]*See* Plaintiff Exhibit 3, PSA, p.151 of 313.     [94] *See* Plaintiff Exhibit 3, PSA, p.151 of 313.
[95] In English, this means *universal things do not detract from specific things.*

51.  The Trustee has blanket immunity from all risk and no accountability for protecting the interest of Certificateholders[96]. The *PSA* states:

> **SECTION 8.02. Certain Matters Affecting the Trustee**
> § 8.02 (vi)  the *Trustee shall not be required to risk or expend its own funds* or otherwise incur any financial liability in the performance of any of its duties or in the exercise of any of its rights or powers hereunder if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not assured to it; [96]
> § 8.02 (vii)  the Trustee shall not be liable for any loss on any investment of funds pursuant to this Agreement (other than as issuer of the investment security); [96]

52.  The Trustee will incur no liability or obligation toward any investor.[97] The *PSA* states:

> § 8.02 (iii) the Trustee shall not be liable for any action taken, suffered or omitted by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by this Agreement; [97]

53.  Granting the Trustee Bank immunity from risk of loss and rendering them harmless from incurring any liability, obligation or *duty* toward an investor undermines any pretense of an agency or fiduciary relationship. The agent must take responsibility for the principal's welfare, particularly when this principal has been rendered defenseless by barriers erected around them. Equally as important, no such relationship is established at the local recorder's office with investors.

**Assignment from MERS to The Bank of New York Mellon**

54.  On March 5, 2012 Mortgage Electronic Registration Systems, Inc.(*MERS*) assigned the Deed of Trust reproduced below:

---

[96] *See* Plaintiff Exhibit 3, PSA, p.167 of 313.
[97] *See* Plaintiff Exhibit 3, PSA, p.167 of 313.

Date of Signing: March 5th, 2012.

Date of Recording: March 8th, 2012.

Requested by Bank of America

### ASSIGNMENT OF DEED OF TRUST

For Value Received, the undersigned holder of a Deed of Trust (herein "Assignor") whose address is **1901 E. Voorhees Street, Suite C, Danville, IL 61834** does hereby grant, sell, assign, transfer and convey unto **THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK, AS TRUSTEE FOR THE CERTIFICATEHOLDERS OF CWALT, INC., ALTERNATIVE LOAN TRUST 2005-63, MORTGAGE PASS THROUGH CERTIFICATES, SERIES 2005-63** whose address is **101 BARCLAY ST-4W, NEW YORK, NY 10286** all beneficial interest under that certain Deed of Trust described below together with the note(s) and obligations therein described and the money due and to become due thereon with interest and all rights accrued or to accrue under said Deed of Trust.

Original Lender:          **E-LOAN, INC.**

Borrower(s):              **WENDLE V. LEHNERD AND BARBARA A. LEHNERD, HUSBAND AND WIFE, AS COMMUNITY PROPERTY WITH RIGHT OF SURVIVORSHIP**

Original Trustee:         **LENDERS FIRST CHOICE**

Date of Deed of Trust: **7/23/2005**          Original Loan Amount: **$264,000**

Recorded in **Pinal County, AZ** on 8/17/2005,

book **N/A**, page **N/A** and instrument no. **2005-106107**

IN WITNESS WHEREOF, the undersigned has caused this Assignment of Deed of Trust to be Executed on MAR 05, 2012.

### MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.

By:  Beverly Brooks Assistant Secretary

State of **California**

County of **Ventura**

On **MAR 05, 2012** before me, **Barbara J. Gibbs,** Notary Public, personally appeared **Beverly Brooks,** who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

**I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.**

WITNESS my hand and official seal.

Notary Public:  Barbara J. Gibbs

My Commission Expires: September 9, 2013

55.  The signer of this *MERS* Assignment, Beverly Brooks, is acting as Assistant Secretary. This signer is a *MERS* Certifying Officer. Beverly Brooks is also a full time employee *and officer* of Bank of America, which was servicing this loan at that time. This mortgage servicer appointed

this *MERS* Certifying Officer to this position and is totally responsible for all acts that they perform.

56.   This standard *Resolution Appointing a MERS Certifying Officer* gives them authority to "assign the lien of any mortgage loan naming *MERS* as the mortgagee... if the mortgage loan is registered on the *MERS* System." Beverly Brooks has exercised this authority in favor of The Bank of New York Mellon. This standard *MERS* Resolution further allows a *MERS* Certifying Officer "to take any such actions and execute such documents as may be necessary to fulfill the Member's *servicing obligations* to the beneficial owner of the mortgage loan."

57.   Assigning the full beneficial interest of a security instrument *is not* a servicing obligation. This can only be done by a party holding the *full beneficial interest.* Neither the mortgage servicer nor *MERS* holds any ownership interest in Plaintiff's loan. Mortgage servicers cannot perform acts reserved to owners.

58.   The true successors in interest to the Lender are investors whose authority have been so circumscribed and marginalized, they do not even have the right to discover what actions are taken concerning loans with they own.

59.   If a mortgage servicer were to first consult with the Lender's true successors in interest, consisting of enough investors to collectively own more than 50% of the debt, they would have to make hundreds of telephone calls and then they would be talking to people with little knowledge of this business. The task of making hundreds of telephone calls is not just bizarre, it would be unthinkable.

60.   One telephone call to Depository Trust, which is the owner of record for all issued securities, would not satisfy this approval requirement. In the first place, Depository Trust is not listed in the local recorder's office. It holds *no recorded ownership interest* in any of these mortgages. Secondly, Depository Trust has nothing to gain or lose from the outcome and nothing invested.

61.   *MERS* Certifying Officers are getting their instructions from the mortgage servicer that writes their paycheck, and the ladder of authority stops there. All of these decisions are being made without consulting the Lender's successor, for one very good reason- there *is no functioning lender*

in this securitized landscape. Decisions made by Certifying Officers are all null and void for lack of authority.

62.   On March 26, 2012, *Stephanie Y. King, Assistant Vice President*, acting on behalf of Bank of America, N.A., *mortgage servicer*, terminated the appointment of the original trustee and appointed substitute trustee in their place.

63.   On May 8, 2014, *Margaret Kwiatanowski, Assistant Vice President*, acting on behalf of Bayview Loan Servicing, LLC, *mortgage servicer*, terminated the appointment of the second trustee and appointed a new substitute trustee in their place.

64.   Paragraph 24 of the Deed of Trust, titled *Substitute Trustee*, allows only the Lender or their successor in interest to appoint a substitute trustee. Before a **MERS** Certifying Officer or a mortgage servicer, as on these two dates, can take this action, they must have the approval of the lender's successors in interest.

65.   If a **MERS** Certifying Officer consulted with the Lender's true successors in interest, consisting of enough investors to own over 50% of the debt, they would make hundreds of phone calls seeking permission to make this substitution, talking to people with a rudimentary knowledge of the business. The laborious and time-consuming nature of this endeavor would stop it from proceeding.

66.   **MERS** Certifying Officers are getting their instructions from the mortgage servicer that writes their paycheck, and the ladder of authority stops there. All of these decisions are being made without consulting the Lender's successor, for one very good reason- there *is no functioning lender* in this securitized landscape. Decisions made by Certifying Officers are all null and void for lack of authority.

### *MERS* and Absence of Functioning Lender Directing Assignment

67.   Under terms in the security instrument, **MERS** *could not* hold any ownership interest in Plaintiff's Property. The best scenario for **MERS** was to hold legal title on behalf of someone else, namely the lender, their successor or assign.

68.   This **MERS** Assignment states that **MERS** *could be* acting on behalf of **E-LOAN, INC.**, its successor or its assign. Since **MERS** can only act as a nominee, it must disclose its *specific*

source of authority. This foundation fact cannot be left to speculation. The fact that no specific source of authority is revealed further confirms the absence of a functioning lender.

69. Since no specific source of authority is disclosed, we are left to conclude that **MERS** is acting on its own behalf or under the mortgage servicer's direction. In both cases, this exercise of authority is rendered void by terms in the Deed of Trust as well as by its own Membership Terms and Conditions.

70. This **MERS** Assignment to The Bank of New York Mellon (BNYM) relies upon a succession of legal conclusions camouflaged as facts. These legal conclusions are: (1) that **MERS** has authority to functionally exercise the powers of a beneficiary on March 5, 2012 in a nominee capacity without disclosing its source of authority;  (2) On March 5, 2012 **MERS** has the power to convey this full beneficial interest to its recipient; (3) **MERS** has the power to transfer money owed on Plaintiff's Note on March 5, 2012 to an assignee; *These legal conclusions are all false.*

71. Pursuant to A.R.S. § 47-3308, Plaintiff challenges the authenticity and legitimacy of Beverly Brooks, **MERS** Certifying Officer, in exercising this authority, and the authenticity and legitimacy of Mortgage Electronic Registration Systems, Inc. to effect any change or transfer to the beneficial ownership of Plaintiff's Deed of Trust and Note.

### Statute of Frauds Invalidates this Assignment

72. In the Deed of Trust, **MERS** is given the power to foreclose and sell *Plaintiff's Property*. This term engages the statute of frauds. A.R.S. § 44-101 applies the Statute of Frauds to every sale of real property, and states:

> **A.R.S. § 44-101. Statute of frauds.** No action shall be brought in any court in the following cases unless the promise or agreement upon which the action is brought, or some memorandum thereof, is in writing and signed by the party to be charged, or by some person by him thereunto lawfully authorized:
> (6) Upon an agreement for leasing for a longer period than one year, or for the sale of real property or an interest therein. Such agreement, if made by an agent of the party sought to be charged, is invalid unless the authority of the agent is in writing, subscribed by the party sought to be charged.

73. The statute of frauds requires: (1) a writing relinquishing that last recorded owner's interest in the Deed of Trust; and (2) this writing must be signed by an authorized officer of the owner. When formalities for the statute of frauds are followed, the new owner acquires the original lender's *contractual relationship* with the borrower. This is known as the *borrower approved*

*interest in land.* Foreclosure statutes require the acquisition of the *borrower approved interest in land* as a pre-requisite for asserting the *statutory power of sale.* If this borrower approved interest in land is not acquired, foreclosure cannot be pursued.

74.   **MERS** has never acquired the borrower's approved interest in land, because the formalities of the statute of frauds were never followed. There is not even a signature on the Deed of Trust confirming a relationship between the original Lender and **MERS**. As a result, **MERS** has not acquired the original Lender's contractual relationship with the borrower and the *borrower approved interest in land.* **MERS** cannot convey an interest that it never acquired.

### Nullifying *MERS*'s Assignment to The Bank of New York Mellon (BNYM)

75.   A.R.S. § 47-3203 addresses the transfer of *a bearer instrument* by a person other than its issuer for the purpose of giving another person the right to enforce its terms. This statute is relevant because Plaintiff's Note and Deed of Trust are bearer instruments. Every **MERS** Assignment is a prelude to enforcement.

76.   A.R.S. § 47-3203(B) dictates what must take place when a bearer instrument is transferred for the purpose of enforcement and states in relevant part:

> (b) "Transfer of an instrument, whether or not the transfer is a negotiation, *vests in the transferee any right of the transferor to enforce the instrument,* including any right as a holder in due course, …" [Emphasis added.]

77.   Pursuant to ¶ (b) of A.R.S. § 47-3203, ownership rights in land are also subject to principles of property law independent of Article 3 of the Uniform Commercial Code (A.R.S. Title 47, Chapter 3). Because of special safeguards in the form of recording statutes, the owner of an interest in land must prove *rightful possession.* This means that an assignor must prove that their prior holder was endowed with the *full beneficial interest.* Official Comment 2 for U.C.C. 3-203(b) explains how this works:

> Because the transferee's rights are derivative of the transferor's rights *those rights must be proved.* …The instrument, by its terms, is not payable to the transferee and the transferee must account for possession of the unindorsed instrument *by proving the transaction through which the transferee acquired it.* [Emphasis added.]

78.  By stipulating for an *unindorsed instrument,* a seller must *prove the transaction through which it was acquired,* this Comment is specifically referring to the *contractual relationship with the borrower* and the *borrower approved interest in land* that is bundled and inextricably intertwined with that contractual relationship. This Comment is also referencing proof that the original holder of this contractual relationship has *relinquished this contractual interest* in the seller's favor. These terms are all direct references to the statute of frauds.

79.  A.R.S. § 47-3203(D) sets forth the rule of law that if anything less than the entire beneficial interest is conveyed, the transferee can receive no greater interest than that which was held by the transferor. This rule of law applies to the ***MERS*** Assignment on March 5, 2012. **BNYM** cannot receive any greater interest than ***MERS*** is in a position to transfer. The true holder of this interest in land cannot be ascertained from the terms in this ***MERS*** Assignment. If the holder of a beneficial interest cannot be established, the interest being conveyed is also illusory and inadequate for enforcement.

80.  In addition, ***MERS*** is barred by its own membership rules from acquiring any beneficial interest *in its own name* for a property posted on its Registry.

81.  ***MERS*** cannot prove that it holds rightful possession of the *full* beneficial interest in Plaintiff's instruments. ***MERS*** cannot even prove that it holds any beneficial interest whatsoever in Plaintiff's Note and Deed of Trust. Three problems are presented, and each can be independently fatal. (1) It has not satisfied the full beneficial interest test imposed by A.R.S. § 47-3203(B) and (D). (2) Its failure to follow formalities imposed by the statute of frauds subjects it to the deterrent in this law and renders the transfer invalid.  (3) Last, but not least, it has not specified the source of authority directing them to take this action.

## FIRST QUIET TITLE CLAIM

82.  Plaintiff challenges the interest held by ***MERS*** and The Bank of New York Mellon (**BNYM**). Plaintiff maintains that the interest of these parties lacks authenticity in essence.

83.  The true beneficial owners of Plaintiff's Property are Investors, each holding a proportional and typically miniscule interest in Plaintiff's Note and Deed of Trust. The only parties

with something to gain or lose from the outcome of Plaintiff's loan are these Investors. Investors are exclusively entitled to Plaintiff's payments. Under terms in the Note, these Investors are the *Note Holder*, and they alone are entitled to accelerate payments and initiate foreclosure.

84.  Investors are the *real parties in interest*.

85.  **MERS** and **BNYM** are wrongly attempting to assert authority reserved exclusively to the beneficial owner. **MERS** and **BNYM** own no interest whatsoever in Plaintiff's lien or Note. **MERS** and **BNYM** do not represent Investors. **MERS** and **BNYM** are not entitled to Plaintiff's payments. **MERS** and **BNYM** have nothing to benefit or lose.

86.  Accordingly, **BNYM** acquired nothing from **MERS** on March 5, 2012, because **MERS** did not hold the full beneficial interest or any beneficial interest in *Plaintiff's Property*. The parties that do hold this full beneficial interest are Investors of *Alternative Loan Trust 2005-63*. These parties are not disclosed. In this quiet title action, Plaintiff seeks Declaratory Relief in the form of a ruling stipulating that these Investors are the true beneficial owners of Plaintiff's title and, before any foreclosure action can be brought, these Investors must be joined as indispensable parties and their interests must be recorded at the Pinal County Recorder's Office, like every other ownership interest in real property.

## SECOND QUIET TITLE CLAIM

87.  Plaintiff challenges the interest held by **MERS** on March 5, 2012 and the validity of its Assignment to **BNYM** because the formalities of the statute of frauds and A.R.S. § 47-3203 were not satisfied.

88.  The terms of the Deed of Trust state that **MERS** can only act on behalf of and as the nominee for the Lender, **E-LOAN, INC.**, or their successor or assign.[98]

89.  The exercise of these powers cannot elude the net cast by the Statute of Frauds. No interest in land can pass without satisfying its formalities.

---

[98] *See* Plaintiff Exhibit 2, Deed of Trust, p.1, 2 and **8**.

90.  It is an irrefutable fact that this Lender never signed a writing disposing of its interest in Plaintiff's Property. The ownership interest in land is still parked with the last recorded beneficial owner and unless and until the Statute of Frauds is satisfied, foreclosure cannot be pursued.

91.  This **MERS** Assignment is invalid for two reasons: (1) For failing to accommodate formalities in the Statute of Frauds, this transfer is ruled invalid because the deterrent attached to the Statute of Frauds declares all such transfers to be unenforceable; (2) It also fails to transfer the full beneficial interest for a bearer instrument, thereby violating A.R.S. § 47-3203(B) and (D).

## THIRD QUIET TITLE CLAIM

92.  A cloud on a title has been described as an outstanding claim, which appears to be valid on its face, but can be shown by extrinsic proof to be invalid.

93.  On March 5, 2012, **MERS** filed an Assignment maintaining that it held a lien as beneficiary of Plaintiff's Deed of Trust.

94.  Extrinsic evidence retrieved from the U.S. Securities and Exchange Commission's search engine reveals transfers of beneficial ownership affecting Plaintiff's Property, all occurring prior to March 5, 2012. This extrinsic evidence can all be found under the corporate filings of *Alternative Loan Trust 2005-63* [CIK# **0001343008** SEC data base.] None of these transfers of beneficial ownership were recorded. All of them qualified as recordable transactions.

95.  All of this extrinsic evidence qualifies as a fact *plausible on its face* for invalidating this March 5, 2012 **MERS** Assignment. Each and every one of these facts also supports a *cognizable legal theory* for invalidating its Assignment. These prior beneficial transfers are published by the federal government as official documents and their integrity and legitimacy cannot be reasonably disputed.

96.  The sole support for this March 5, 2012 **MERS** Assignment is a formulaic term in the Deed of Trust. Plaintiff's extrinsic evidence is *worthy of belief*, and it supports a cognizable legal theory for repudiating this formulaic term.

### FOURTH QUIET TITLE CLAIM

97.   **MERS** holds only a ministerial interest in this transaction, at most. Through *legal trickery*, as described throughout this complaint, **MERS** has attempted to maneuver a ministerial interest into the appearance of a full beneficial interest. To reach this end, it has engaged the fallacy that it is acting on behalf of the Lender's successor in interest.

98.   **MERS** is actually acting upon instructions from the mortgage servicer. There is no functioning Lender. Through legal trickery, **MERS** is placing itself in a position to exercise legal leverage, that is has no authority whatsoever to exercise.

### Quiet Title Statute and Claims against Specific Defendants

99. A.R.S. § 12-1101, *Parties; claim;* states in pertinent part:

> A. An action to determine and quiet title to real property may be brought by any one having or claiming an interest therein, whether in or out of possession, against any person or the state when such person or the state claims an estate or interest in the real property which is adverse to the party bringing the action.

100.   Plaintiff holds an equitable interest in *Plaintiff's Property* by virtue of a Note signed on July 23, 2005 and a Deed of Trust recorded August 17, 2005.

101.   Defendant **E-LOAN, INC.** has an interest in *Plaintiff's Property* by virtue of the above described unsigned Note and Deed of Trust. **MERS** and **The Bank of New York Mellon** have an interest in *Plaintiff's Property* by virtue of a **MERS** Assignment recorded on March 5, 2012. These are the only parties with a recorded interest in Plaintiff's Property.

102.   For the purposes of A.R.S. § 12-1101, the date of filing this Complaint shall also serve as the date in which a determination is sought.

103.   Plaintiff brings Quiet Title action against **E-LOAN, INC.**, and requires this party to demonstrate how any transfer of the *contractual relationship with the borrower*, which includes the borrower approved interest in land, can take place without fulfilling statute of frauds formalities prior to the March 5, 2012 **MERS** Assignment.

104.  Plaintiff brings this action against *Mortgage Electronic Registration Systems, Inc*. and asks this defendant to demonstrate how it could be in a position to hold and convey the full beneficial interest in Plaintiff's Deed of Trust *and* Note on March 5, 2012, when it had no ownership interest in the Note, the Statute of Frauds had been ignored, and it could not prove the full beneficial transfer of ownership for this bearer instrument from its seller, as A.R.S. § 47-3203 requires.

105.  Plaintiff asks *The Bank of New York Mellon* to prove that it is entitled to payments made by Plaintiff *for its own use*. Under terms in the Note, the only party with the right to enforce this obligation is the party entitled to payments for their own use.

106.  Plaintiff concedes that a mortgage loan was signed, and Plaintiff is indebted to the rightful owner of this lien. Plaintiff contends that the true owner is known but not identified and their names are not discoverable. Plaintiff asks this Court to use its Declaratory Judgment Authority to expose these imposters by removing these clouds and false claims of ownership to Plaintiff's Deed of Trust and Note appearing in this chain of title at the Pinal County Recorder's Office by ordering the following relief.

## Prayer for Relief

1.  Pursuant to A.R.S. §12-1101, Plaintiff respectfully asks this Court to issue a declaratory judgment finding that the interest of *MERS* in Plaintiff's Note and Deed of Trust on March 5, 2012 was void and of no legal force. The Court should declare these *MERS* practices as chicanery.

2.  Pursuant to A.R.S. §12-1101, Plaintiff asks this court to declare that each and every one of these defendants should be disqualified from enforcing Plaintiff's Note and Deed of Trust, and to order defendants to summon the true current owners consisting of holders of mortgage-backed securities owning at least a majority interest in Plaintiff's Note and Deed of Trust.

3.  This Court's declaratory judgment should further address each and every one of the clouds upon *Plaintiff's Property* and order such legal and equitable relief as is necessary for removing these clouds.

4.   Plaintiff further requests reimbursement of all expense paid in connection with this legal proceeding, including court costs and reasonable attorney fees.

5.   Plaintiff further requests any other relief in the form of specific performance and compensation warranted by evidence in the Record.

Respectfully submitted by:

*Wendle V. Lehnerd*

Wendle V. Lehnerd, homeowner

33276 N. Cherry Creek Rd, Queen Creek, AZ 85142

(602) 295-6175

# EXHIBIT LIST

EXHIBIT 1   NOTE, DATED 7/23/05

EXHIBIT 2   DEED OF TRUST, DATED 7/23/05

EXHIBIT 3   POOLING AND SERVICING AGREEMENT, DATED 10/01/05

EXHIBIT 4   MERS TERMS AND CONDITIONS

EXHIBIT 5   MERS ASSIGNMENT, DATED 3/05/12

EXHIBIT 6   SUBSTITUTION OF TRUSTEE, DATED 3/26/12

EXHIBIT 7   SUBSTITUTION OF TRUSTEE, DATED 5/08/14

EXHIBIT 8   NOTICE OF TRUSTEE SALE, DATED 5/14/14

EXHIBIT 9   MAXIMS OF LAW

EXHIBIT 10  RECORDED NOTICE OF DEFAULT/AFFIDAVIT OF TRUTH, 8/12/13

# EXHIBIT 1

**NOTE, DATED 7/23/05**

(104604545

LOAN #: A086A425
MIN: 100039610008644956

## InterestFirst℠ ADJUSTABLE RATE NOTE
### (One-Year LIBOR Index (As Published In The Wall Street Journal) - Rate Caps)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR A CHANGE IN MY FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE AND FOR CHANGES IN MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

JULY 23, 2005                          Frisco,                                TEXAS
[Date]                                 [City]                                 [State]

33276 N. Cherry Creek Road, Queen Creek, AZ 85242
[Property Address]

**1.  BORROWER'S PROMISE TO PAY**
In return for a loan that I have received, I promise to pay U.S.      $264,000.00      (this amount is called "Principal"), plus interest, to the order of Lender. Lender is      E-LOAN, INC., A DELAWARE CORPORATION.

I will make all payments under this Note in the form of cash, check or money order.
I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2.  INTEREST**
Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of      6.000%.      The interest rate I will pay may change in accordance with Section 4 of this Note.
The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**3.  PAYMENTS**
**(A) Time and Place of Payments**
I will make a payment on the      1ST      day of every month, beginning on      SEPTEMBER 1, 2005.
Before the First Principal and Interest Payment Due Date as described in Section 4 of this Note, my payment will consist only of the interest due on the unpaid principal balance of this Note. Thereafter, I will pay principal and interest by making a payment every month as provided below.
I will make my monthly payments of principal and interest beginning on the First Principal and Interest Payment Due Date as described in Section 4 of this Note. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date, and if the payment includes both principal and interest, it will be applied to interest before Principal. If, on      AUGUST 1, 2035,      I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."
I will make my monthly payments at
6230 STONERIDGE MALL ROAD
PLEASANTON, CA 94588

or at a different place if required by the Note Holder.
**(B) Amount of My Initial Monthly Payments**
My monthly payment will be in the amount of U.S.      $1,320.00      before the First Principal and Interest Payment Due Date, and thereafter will be in an amount sufficient to repay the principal and interest at the rate determined as described in Section 4 of this Note in substantially equal installments by the Maturity Date. The Note Holder will notify me prior to the date of change in monthly payment.
**(C) Monthly Payment Changes**
Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 or 5 of this Note.

**4.  ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES**
**(A) Change Dates**
The initial fixed interest rate I will pay will change to an adjustable interest rate on the      1ST      day of AUGUST, 2010      and the adjustable interest rate I will pay may change on that day every      12TH      month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."
**(B) The Index**
Beginning with the first Change Date, my adjustable interest rate will be based on an index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as

Initials: _____



610   104604545   N   001   002

LOAN #: A0864495

published in The Wall Street Journal. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **TWO AND ONE-FOURTH** percentage point(s) ( **2.250%** ) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **11.000%** or less than **2.250%**. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than **TWO** percentage point(s) ( **2.000%** ) from the rate of interest I have been paying for the preceding 12 month(s). My interest rate will never be greater than **11.000%**.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

Before the effective date of any change in my interest rate and/or monthly payment, the Note Holder will deliver or mail to me a notice of such change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**(G) Date of First Principal and Interest Payment**

The date of my first payment consisting of both principal and interest on this Note (the "First Principal and Interest Payment Due Date") shall be the first monthly payment date after the first Change Date.

**5.  BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date of my monthly payment unless the Note Holder agrees in writing to those changes. If the partial Prepayment is made during the period when my monthly payments consist only of interest, the amount of the monthly payment will decrease for the remainder of the term when my payments consist only of interest. If the partial Prepayment is made during the period when my payments consist of principal and interest, my partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.   **THIS SECTION IS SUPERSEDED BY THE ADDENDUM ATTACHED HERETO AND MADE A PART HEREOF.**

**6.  LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7.  BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **5.000%** of my overdue payment of interest, during the period when my payment is interest only, and of principal and interest thereafter. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered to me by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

Initials: _NW_

MULTISTATE InterestFirst ADJUSTABLE RATE NOTE - ONE-YEAR LIBOR INDEX - Single Family - Fannie Mae Uniform Instrument
Form 3530 11/01
© 2001-2005 Online Documents, Inc.

F8530NOT 0507
07-22-2005 16:55

**(E) Payment of Note Holder's Costs and Expenses**
If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8.  GIVING OF NOTICES**
Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.
Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9.  OBLIGATIONS OF PERSONS UNDER THIS NOTE**
If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10.  WAIVERS**
I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11.  UNIFORM SECURED NOTE**
This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:
(A)  Until my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument shall read as follows:
Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.
If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.
If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.
(B)  When my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument described in Section 11(A) above shall then cease to be in effect, and Uniform Covenant 18 of the Security Instrument shall instead read as follows:
Transfer of the Property of a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.
If all of any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.
To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.
If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If

Initials: _____

LOAN #: A0864495

Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.**

**THE PROVISIONS CONTAINED IN THE "ADDENDUM TO NOTE", SIGNED BY ALL BORROWERS NAMED HEREIN, ARE HEREBY INCORPORATED INTO AND SHALL AMEND AND SUPPLEMENT THIS NOTE.**

_____ (Seal)
Wendle V Lehnerd

PAY TO THE ORDER OF
COUNTRYWIDE HOME LOANS INC.
WITHOUT RECOURSE
COUNTRYWIDE BANK, N.A.
BY: _____
LAURIE MEDER
SENIOR VICE PRESIDENT

PAY TO THE ORDER OF
Countrywide Bank, N.A.
WITHOUT RECOURSE
DAVID DINI
TREASURY ANALYST
E-LOAN, INC.
6230 STONERIDGE MALL RD.
PLEASANTON, CA 94588

PAY TO THE ORDER OF
WITHOUT RECOURSE
COUNTRYWIDE HOME LOANS, INC.
BY _____
David A. Spector
Managing Director

**[Sign Original Only]**

# EXHIBIT 2

## DEED OF TRUST, DATED 7/23/05





**OFFICIAL RECORDS OF**
**PINAL COUNTY RECORDER**
**LAURA DEAN-LYTLE**

DATE/TIME: 08/17/05 1618
FEE:                    $27.00
PAGES:                     18
FEE NUMBER:  2005-106107

Prepared by:
~~After Recording Return To:~~
STEWART MORTGAGE INFORMATION
E-LOAN TRAILING DOCUMENTS
3910 KIRBY DRIVE SUITE 300
HOUSTON, TX 77098
800-795-5263

Title Order No.: 36-01680232
Escrow No.: 36-01680232
LOAN #: A0864495

36-723 3460
PLEASE RETURN TO REC. DEPT.
Lenders First Choice
3850 Royal Avenue
Simi Valley, CA 93063

——————— [Space Above This Line For Recording Data] ———————

## DEED OF TRUST

| MIN 100039610008664956 |

**DEFINITIONS**
Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.
**(A) "Security Instrument"** means this document, which is dated      **JULY 23, 2005,**                    together with all Riders to this document.
**(B) "Borrower"** is  **Wendle V Lehnerd and Barbara A. Lehnerd, husband and wife, as community property with right of survivorship..**

Borrower is the trustor under this Security Instrument. Borrower's mailing address is **33276 N. Cherry Creek Road, Queen Creek, AZ 85242.**

**(C) "Lender"** is  **E-LOAN, INC.**

Lender is a **DELAWARE CORPORATION,**                                  organized and existing under the laws of
**THE STATE OF DELAWARE.**                               Lender's mailing address is  **6230 STONERIDGE**
**MALL ROAD, PLEASANTON, CA 94588.**

**(D) "Trustee"** is  **Lenders First Choice.**

Trustee's mailing address is **3803 Parkwood Boulevard, Suite 100, Frisco, TX 75034.**

**(E) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
**(F) "Note"** means the promissory note signed by Borrower and dated **JULY 23, 2005.**            The Note states that Borrower owes Lender ••••••••••••••••••••**TWO HUNDRED SIXTY FOUR THOUSAND AND NO/100**
•••••••••••••••••••••••••••••••••••••••••••••••••••••••• Dollars (U.S.     **$264,000.00    )**
plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **AUGUST 1, 2035.**

Initials: _[signature]_

ARIZONA–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3003 1/01 (rev. 6/02)
© 1999-2004 Online Documents, Inc.                    **Page 1 of 9**                    AZEDEED 0402
                                                                 07-22-2005 16:55

LOAN #: A0864495

(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."
(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [x] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [x] Planned Unit Development Rider | [x] Other(s) [specify] |
| [ ] 1-4 Family Rider | [ ] Biweekly Payment Rider | PREPAYMENT RIDER |
| [ ] V.A. Rider | | |

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(M) "Escrow Items" means those items that are described in Section 3.
(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.
(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.
(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY
The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the   COUNTY
[Type of Recording Jurisdiction] of Maricopa Pinal                                    [Name of Recording Jurisdiction]:
See legal description attached hereto and made a part hereof.
APN #: 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

which currently has the address of 33276 N. Cherry Creek Road, Queen Creek,                    [Street] [City]

Arizona      85242       ("Property Address"):                                        [Street] [City]
             [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

ARIZONA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT      Form 3003 1/01 (rev. 6/02)
© 1999-2004 Online Documents, Inc.                        Page 2 of 9

Initials: _____
AZEDEED   0402
07-22-2005 16:55

LOAN #: A0864695

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in

Initials: [signature]

AZEDEED  0402
07-22-2005 16:55

LOAN #: A0864495

accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.   Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.   Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.   Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

ARIZONA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT   Form 3003 1/01 (rev. 6/02)
© 1999-2004 Online Documents, Inc.                          Page 4 of 9

Initials: [handwritten]

AZEDEED   0402

07-22-2005 16:35

LOAN #: A0864495

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

Initials: _____

ARIZONA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT      Form 3003 1/01 (rev. 6/02)
© 1999-2004 Online Documents, Inc.                    Page 5 of 9                    AZEDEED   0402
                                                                                     07-22-2005 16:55

LOAN #: AG966495

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default if, acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. Loan Charges. Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but

Initials: [signature]

ARIZONA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT   Form 3003 1/01 (rev. 6/02)
© 1999-2004 Online Documents, Inc.   Page 6 of 9   AZEDEED   0402
07-22-2005  16:55

LOAN #: 20866495

not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. Notices. All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. Governing Law; Severability; Rules of Construction. This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. Borrower's Copy. Borrower shall be given one copy of the Note and of this Security Instrument.

18. Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. Borrower's Right to Reinstate After Acceleration. If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower

Initials: _____

ARIZONA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3003 1/01 (rev. 6/02)
© 1999-2004 Online Documents, Inc.    Page 7 of 9    AZEDEED  0402

07-22-2005  16:55

LOAN #: A0864495

will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. (a) Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give written notice to Trustee of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall record a notice of sale in each county in which any part of the Property is located and shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. After the time required by Applicable Law and after publication and posting of the notice of sale, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder for cash at the time and place designated in the notice of sale. Trustee may postpone sale of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it or to the county treasurer of the county in which the sale took place.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Substitute Trustee. Lender may, for any reason or cause, from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

25. Time of Essence. Time is of the essence in each covenant of this Security Instrument.

Initials: _____

ARIZONA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT   Form 3003 1/01 (rev. 6/02)
© 1999-2004 Online Documents, Inc.                     Page 8 of 9                     AGED  0402
                                                                                07-22-2005 16:55

LOAN #: A0866495

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_Wendle V Lehnerd_ (Seal)
Wendle V Lehnerd

_Barbara A Lehnerd_ (Seal)
/Barbara A Lehnerd

COLLEEN KEEGAN FALCONE
Notary Public - Arizona
Coconino County
My Comm. Expires Mar 26, 2009

State of ARIZONA                                    County of _Coconino_

   The foregoing instrument was acknowledged before me this _7/26/05_
(date) by Wendle V Lehnerd AND Barbara A Lehnerd.

My Commission Expires: _3/26/2009_        _Colleen Keegan Falcone_
                                                    Notary Public

PLEASE RETURN TO REC. DEPT.
Lenders First Choice
3850 Royal Avenue
Simi Valley, CA 93063

# EXHIBIT 3

### POOLING AND SERVICING AGREEMENT, DATED 10/01/05
### ALTERNATIVE LOAN TRUST 2005-63, 8-K REPORT
### FILED WITH THE SECURITIES AND EXCHANGE COMMISSION
[selected pertinent sections with full table of contents list]

-----------

[The complete 8-K, as filed at SEC takes up 313 pages on SEC search engine. The
***following selected pertinent pages*** (36 total) are included to make this exhibit:
Pages 6-12, 27, 31, 32, 45, 67, 70-76, 124, 125, 127-129, 131, 143-147, 149, 151-153, 167 & 169]

| EX-99.1 | **2nd Page of 212** | TOC | 1st | Previous | Next | ↓Bottom | Just 2nd |

EXECUTION COPY

================================

CWALT, INC.,

Depositor

COUNTRYWIDE HOME LOANS, INC.,

Seller

PARK GRANADA LLC,

Seller

PARK MONACO INC.,

Seller

PARK SIENNA LLC,

Seller

COUNTRYWIDE HOME LOANS SERVICING LP,

Master Servicer

and

THE BANK OF NEW YORK,

Trustee

------------------------------------

POOLING AND SERVICING AGREEMENT
Dated as of October 1, 2005

------------------------------------

ALTERNATIVE LOAN TRUST 2005-63

MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2005-63

================================

[Enlarge/Download Table]

*Table of Contents*

Page
----

### ARTICLE I DEFINITIONS

### ARTICLE II CONVEYANCE OF MORTGAGE LOANS; REPRESENTATIONS AND WARRANTIES

SECTION 2.01.    Conveyance of Mortgage Loans.......................................................31
SECTION 2.02.    Acceptance by Trustee of the Mortgage Loans.......................................35
SECTION 2.03.    Representations, Warranties and Covenants of the Sellers and Master Servicer.....37
SECTION 2.04.    Representations and Warranties of the Depositor as to the Mortgage Loans.........39
SECTION 2.05.    Delivery of Opinion of Counsel in Connection with Substitutions..................40
SECTION 2.06.    Execution and Delivery of Certificates...........................................40
SECTION 2.07.    REMIC Matters....................................................................40
SECTION 2.08.    Covenants of the Master Servicer.................................................41

### ARTICLE III ADMINISTRATION AND SERVICING OF MORTGAGE LOANS

SECTION 3.01.    Master Servicer to Service Mortgage Loans.........................................42
SECTION 3.02.    Subservicing; Enforcement of the Obligations of Subservicers......................43
SECTION 3.03.    Rights of the Depositor and the Trustee in Respect of the Master Servicer.........43
SECTION 3.04.    Trustee to Act as Master Servicer................................................44
SECTION 3.05.    Collection of Mortgage Loan Payments; Certificate Account; Distribution Account...44
SECTION 3.06.    Collection of Taxes, Assessments and Similar Items; Escrow Accounts..............47
SECTION 3.07.    Access to Certain Documentation and Information Regarding the Mortgage Loans......48
SECTION 3.08.    Permitted Withdrawals from the Certificate Account and the Distribution Account...48
SECTION 3.09.    Maintenance of Hazard Insurance; Maintenance of Primary Insurance Policies........50
SECTION 3.10.    Enforcement of Due-on-Sale Clauses; Assumption Agreements........................51
SECTION 3.11.    Realization Upon Defaulted Mortgage Loans; Repurchase of Certain Mortgage Loans...52
SECTION 3.12.    Trustee to Cooperate; Release of Mortgage Files..................................56
SECTION 3.13.    Documents, Records and Funds in Possession of Master
                 Servicer to be Held for the Trustee. ...........................................57
SECTION 3.14.    Servicing Compensation..........................................................57

i

SECTION 3.15.   Access to Certain Documentation.........................................57
SECTION 3.16.   Annual Statement as to Compliance......................................58
SECTION 3.17.   Annual Independent Public Accountants' Servicing Statement; Financial Statements..58
SECTION 3.18.   Errors and Omissions Insurance; Fidelity Bonds.........................59
SECTION 3.19.   Notification of Adjustments............................................59

                         ARTICLE IV DISTRIBUTIONS AND ADVANCES BY THE MASTER SERVICER

SECTION 4.01.   Advances...............................................................60
SECTION 4.02.   Priorities of Distribution.............................................61
SECTION 4.03.   [Reserved].............................................................66
SECTION 4.04.   Allocation of Realized Losses..........................................66
SECTION 4.05.   Cross-Collateralization; Adjustments to Available Funds................67
SECTION 4.06.   Monthly Statements to Certificateholders...............................68
SECTION 4.07.   Determination of Pass-Through Rates for COFI Certificates..............70
SECTION 4.08.   Determination of Pass-Through Rates for LIBOR Certificates.............71

                                   ARTICLE V THE CERTIFICATES

SECTION 5.01.   The Certificates.......................................................74
SECTION 5.02.   Certificate Register; Registration of Transfer and Exchange of Certificates......74
SECTION 5.03.   Mutilated, Destroyed, Lost or Stolen Certificates......................79
SECTION 5.04.   Persons Deemed Owners..................................................79
SECTION 5.05.   Access to List of Certificateholders' Names and Addresses..............79
SECTION 5.06.   Maintenance of Office or Agency........................................80

                         ARTICLE VI THE DEPOSITOR AND THE MASTER SERVICER

SECTION 6.01.   Respective Liabilities of the Depositor and the Master Servicer........81
SECTION 6.02.   Merger or Consolidation of the Depositor or the Master Servicer........81
SECTION 6.03.   Limitation on Liability of the Depositor, the Sellers, the Master
                Servicer and Others....................................................81
SECTION 6.04.   Limitation on Resignation of Master Servicer...........................82

                                    ARTICLE VII DEFAULT

SECTION 7.01.   Events of Default......................................................83
SECTION 7.02.   Trustee to Act; Appointment of Successor...............................84
SECTION 7.03.   Notification to Certificateholders.....................................86

                             ARTICLE VIII CONCERNING THE TRUSTEE

SECTION 8.01.   Duties of Trustee......................................................87
SECTION 8.02.   Certain Matters Affecting the Trustee..................................88
SECTION 8.03.   Trustee Not Liable for Certificates or Mortgage Loans..................89

                                           ii

SECTION 8.04.   Trustee May Own Certificates.............................................89
SECTION 8.05.   Trustee's Fees and Expenses.............................................89
SECTION 8.06.   Eligibility Requirements for Trustee....................................90
SECTION 8.07.   Resignation and Removal of Trustee......................................90
SECTION 8.08.   Successor Trustee.......................................................91
SECTION 8.09.   Merger or Consolidation of Trustee......................................91
SECTION 8.10.   Appointment of Co-Trustee or Separate Trustee...........................92
SECTION 8.11.   Tax Matters.............................................................93


                              ARTICLE IX TERMINATION

SECTION 9.01.   Termination upon Liquidation or Purchase of all Mortgage Loans..........96
SECTION 9.02.   Final Distribution on the Certificates..................................96
SECTION 9.03.   Additional Termination Requirements.....................................97


                        ARTICLE X MISCELLANEOUS PROVISIONS

SECTION 10.01.  Amendment...............................................................99
SECTION 10.02.  Recordation of Agreement; Counterparts.................................100
SECTION 10.03.  Governing Law..........................................................101
SECTION 10.04.  Intention of Parties...................................................101
SECTION 10.05.  Notices................................................................101
SECTION 10.06.  Severability of Provisions.............................................102
SECTION 10.07.  Assignment.............................................................103
SECTION 10.08.  Limitation on Rights of Certificateholders.............................103
SECTION 10.09.  Inspection and Audit Rights............................................104
SECTION 10.10.  Certificates Nonassessable and Fully Paid..............................104
SECTION 10.11.  [Reserved].............................................................104
SECTION 10.12.  Protection of Assets...................................................104

## SCHEDULES

Schedule I:        Mortgage Loan Schedule...........................................................S-I-1
Schedule II-A:     Representations and Warranties of Countrywide.....................................S-II-A-1
Schedule II-B:     Representations and Warranties of Park Granada....................................S-II-B-1
Schedule II-C:     Representations and Warranties of Park Monaco Inc.................................S-II-C-1
Schedule II-D      Representations and Warranties of Park Sienna LLC.................................S-II-D-1
Schedule III-A:    Representations and Warranties of Countrywide as to the Mortgage Loans............S-III-A-1
Schedule III-B:    Representations and Warranties of Countrywide as to the Countrywide
                   Mortgage Loans...................................................................S-III-B-1
Schedule III-C:    Representations and Warranties of Park Granada as to the Park Granada
                   Mortgage Loans...................................................................S-III-C-1
Schedule III-D     Representations and Warranties of Park Monaco Inc.
                   as to the Park Monaco Inc. Mortgage Loans........................................S-III-D-1
Schedule III-E     Representations and Warranties of Park Sienna LLC
                   as to the Park Sienna LLC Mortgage Loans.........................................S-III-E-1
Schedule IV:       Representations and Warranties of the Master Servicer.............................S-IV-1
Schedule V:        Principal Balance Schedules (if applicable)......................................S-V-1
Schedule VI:       Form of Monthly Master Servicer Report...........................................S-VI-1

## EXHIBITS

Exhibit A:         Form of Senior Certificate (excluding Notional Amount Certificates)...............A-1
Exhibit B:         Form of Subordinated Certificate.................................................B-1
Exhibit C-1:       Form of Class A-R Certificate....................................................C-1-1
Exhibit C-2:       Form of Class P Certificate......................................................C-2-1
Exhibit D:         Form of Notional Amount Certificate..............................................D-1
Exhibit E:         Form of Reverse of Certificates..................................................E-1
Exhibit F-1:       Form of Initial Certification of Trustee.........................................F-1-1
Exhibit F-2:       [Reserved].......................................................................F-2-1
Exhibit G-1:       Form of Delay Delivery Certification of Trustee..................................G-1-1
Exhibit G-2:       [Reserved].......................................................................G-2-1
Exhibit H-1:       Form of Final Certification of Trustee...........................................H-1-1
Exhibit H-2:       [Reserved].......................................................................H-2-1
Exhibit I:         Form of Transfer Affidavit.......................................................I-1
Exhibit J-1:       Form of Transferor Certificate (Residual)........................................J-1-1
Exhibit J-2:       Form of Transferor Certificate (Private).........................................J-2-1
Exhibit K:         Form of Investment Letter [Non-Rule 144A]........................................K-1
Exhibit L:         Form of Rule 144A Letter.........................................................L-1
Exhibit M:         Form of Request for Release (for Trustee)........................................M-1
Exhibit N:         Form of Request for Release of Documents (Mortgage Loan - Paid
                   in Full, Repurchased and Replaced)...............................................N-1
Exhibit O:         [Reserved].......................................................................O-1
Exhibit P:         [Reserved].......................................................................P-1
Exhibit Q:         Standard & Poor's LEVELS(R) Version 5.6c Glossary Revised,
                   Appendix E.......................................................................Q-1
Exhibit R:         [Reserved].......................................................................R-1
Exhibit S-1:       [Reserved].......................................................................S-1-1

iv

Exhibit S-2:     [Reserved]........................................................................S-2-1

v

Case 2:14-cv-01811-SPL   Document 1   Filed 08/14/14   Page 48 of 95

| EX-99.1 | **8th Page of 212** | TOC | 1st | Previous | Next | ↓Bottom | Just 8th |
|---------|---------------------|-----|-----|----------|------|---------|----------|

    THIS POOLING AND SERVICING AGREEMENT, dated as of October 1, 2005, among CWALT, INC., a Delaware corporation, as depositor (the *"Depositor"*), COUNTRYWIDE HOME LOANS, INC. (*"Countrywide"*), a New York corporation, as a seller (a *"Seller"*), PARK GRANADA LLC (*"Park Granada"*), a Delaware limited liability company, as a seller (a *"Seller"*), PARK MONACO INC. (*"Park Monaco"*), a Delaware corporation, as a seller (a *"Seller"*), PARK SIENNA LLC (*"Park Sienna"*), a Delaware limited liability company, as a seller (a *"Seller"*), COUNTRYWIDE HOME LOANS SERVICING LP, a Texas limited partnership, as master servicer (the *"Master Servicer"*), and THE BANK OF NEW YORK, a banking corporation organized under the laws of the State of New York, as trustee (the *"Trustee"*).

### WITNESSETH THAT

    In consideration of the mutual agreements contained in this Agreement, the parties to this Agreement agree as follows:

### PRELIMINARY STATEMENT

    The Depositor is the owner of the Trust Fund that is hereby conveyed to the Trustee in return for the Certificates. For federal income tax purposes, the Trust Fund, will consist of two real estate mortgage investment conduits (each a *"REMIC"* or, in the alternative, the *"Subsidiary REMIC"* and the *"Master REMIC,"* respectively). Each Certificate, other than the Class A-R Certificate, will represent ownership of one or more regular interests in the Master REMIC for purposes of the REMIC Provisions. The Class A-R Certificate represents ownership of the sole class of residual interest in the Subsidiary REMIC and the Master REMIC. The Master REMIC will hold as assets the several classes of uncertificated Subsidiary REMIC Interests (other than the Class SR-A-R Interest). The Subsidiary REMIC will hold as assets all property of the Trust Fund. Each Subsidiary REMIC Interest (other than the Class SR-A-R Interest) is hereby designated as a regular interest in the Subsidiary REMIC. The latest possible maturity date of all REMIC regular interests created in this Agreement shall be the Latest Possible Maturity Date.

| **EX-99.1** | **19th Page of 212** | TOC | 1st | Previous | Next | ↓Bottom | Just 19th |

Master Servicer for the benefit of the Trustee on behalf of Certificateholders and designated *"Countrywide Home Loans Servicing LP in trust for the registered holders of Alternative Loan Trust 2005-63, Mortgage Pass-Through Certificates Series 2005-63."*

**Certificate Balance:** With respect to any Certificate at any date, the maximum dollar amount of principal to which the Holder thereof is then entitled under this Agreement, such amount being equal to the Denomination of that Certificate (A) plus any increase in the Certificate Balance of such Certificate pursuant to Section 4.02 due to the receipt of Subsequent Recoveries (B) minus the sum of (i) all distributions of principal previously made with respect to that Certificate and (ii) all Realized Losses allocated to that Certificate and, in the case of the Subordinated Certificates, all other reductions in Certificate Balance previously allocated to that Certificate pursuant to Section 4.04 without duplication and (C) in the case of any Class of Accrual Certificates, increased by the Accrual Amount added to the Class Certificate Balance of such Class prior to such date.

Certificate Group: The Group 1 Certificates, Group 2 Certificates, Group 3 Certificates, Group 4 Certificates or Group 5 Certificates, as the context requires.

Certificate Owner: With respect to a Book-Entry Certificate, the Person who is the beneficial owner of such Book-Entry Certificate. For the purposes of this Agreement, in order for a Certificate Owner to enforce any of its rights under this Agreement, it shall first have to provide evidence of its beneficial ownership interest in a Certificate that is reasonably satisfactory to the Trustee, the Depositor, and/or the Master Servicer, as applicable.

Certificate Register: The register maintained pursuant to Section 5.02 of this Agreement.

Certificateholder or Holder: The person in whose name a Certificate is registered in the Certificate Register, except that, solely for the purpose of giving any consent pursuant to this Agreement, any Certificate registered in the name of the Depositor or any affiliate of the Depositor shall be deemed not to be Outstanding and the Percentage Interest evidenced thereby shall not be taken into account in determining whether the requisite amount of Percentage Interests necessary to effect such consent has been obtained; provided, however, that if any such Person (including the Depositor) owns 100% of the Percentage Interests evidenced by a Class of Certificates, such Certificates shall be deemed to be Outstanding for purposes of any provision of this Agreement (other than the second sentence of Section 10.01) that requires the consent of the Holders of Certificates of a particular Class as a condition to the taking of any action under this Agreement. The Trustee is entitled to rely conclusively on a certification of the Depositor or any affiliate of the Depositor in determining which Certificates are registered in the name of an affiliate of the Depositor.

Class: All Certificates bearing the same class designation as set forth in the Preliminary Statement.

Class Certificate Balance: With respect to any Class and as to any date of determination, the aggregate of the Certificate Balances of all Certificates of such Class as of such date.

Class Interest Shortfall: As to any Distribution Date and Class, the amount by which the amount described in clause (i) of the definition of Class

Class B Subsidiary REMIC Interests, a situation in which the Class A and Class B Interests corresponding to any Loan Group are in the aggregate less than 1% of the Subordinated Portion of the Loan Group to which they correspond.

Cut-off Date: As to any Mortgage Loan, the later of the date of origination of that Mortgage Loan and October 1, 2005.

Cut-off Date Pool Principal Balance: $731,236,068.64.

Cut-off Date Principal Balance: As to any Mortgage Loan, the Stated Principal Balance thereof as of the close of business on the Cut-off Date.

Debt Service Reduction: With respect to any Mortgage Loan, a reduction by a court of competent jurisdiction in a proceeding under the Bankruptcy Code in the Scheduled Payment for such Mortgage Loan that became final and non-appealable, except such a reduction resulting from a Deficient Valuation or any reduction that results in a permanent forgiveness of principal.

Defective Mortgage Loan: Any Mortgage Loan that is required to be repurchased pursuant to Section 2.02 or 2.03.

Deficient Valuation: With respect to any Mortgage Loan, a valuation by a court of competent jurisdiction of the Mortgaged Property in an amount less than the then-outstanding indebtedness under the Mortgage Loan, or any reduction in the amount of principal to be paid in connection with any Scheduled Payment that results in a permanent forgiveness of principal, which valuation or reduction results from an order of such court which is final and non-appealable in a proceeding under the Bankruptcy Code.

**Definitive Certificates**: Any Certificate evidenced by a Physical Certificate and any Certificate issued in lieu of a Book-Entry Certificate pursuant to Section 5.02(e).

Delay Certificates: As specified in the Preliminary Statement.

**Delay Delivery Certification**: As defined in Section 2.02(a).

Delay Delivery Mortgage Loans: The Mortgage Loans for which all or a portion of a related Mortgage File is not delivered to Trustee on the Closing Date. With respect to up to 50% of the Mortgage Loans in each Loan Group, the Depositor may deliver all or a portion of each related Mortgage File to the Trustee not later than thirty days after the Closing Date. To the extent that Countrywide Servicing shall be in possession of any Mortgage Files with respect to any Delay Delivery Mortgage Loan, until delivery of such Mortgage File to the Trustee as provided in Section 2.01, Countrywide Servicing shall hold such files as Master Servicer hereunder, as agent and in trust for the Trustee.

**Deleted Mortgage Loan**: As defined in Section 2.03(c) of this Agreement.

**Denomination**: With respect to each Certificate, the amount set forth on the face of that Certificate as the *"Initial Certificate Balance of this Certificate"* or the *"Initial Notional Amount of this Certificate"* or, if neither of the foregoing, the Percentage Interest appearing on the face thereof.

7

**Depositor:** CWALT, Inc., a Delaware corporation, or its successor in interest.

Depository: The initial Depository shall be The Depository Trust Company, the nominee of which is CEDE & Co., as the registered Holder of the Book-Entry Certificates. The Depository shall at all times be a *"clearing corporation"* as defined in Section 8-102(a)(5) of the Uniform Commercial Code of the State of New York.

Depository Participant: A broker, dealer, bank or other financial institution or other Person for whom from time to time a Depository effects book-entry transfers and pledges of securities deposited with the Depository.

Determination Date: As to any Distribution Date, the 22nd day of each month or, if such 22nd day is not a Business Day, the next preceding Business Day; provided, however, that if such 22nd day or such Business Day, whichever is applicable, is less than two Business Days prior to the related Distribution Date, the Determination Date shall be the first Business Day that is two Business Days preceding such Distribution Date.

Distribution Account: The separate Eligible Account created and maintained by the Trustee pursuant to Section 3.05(d) in the name of the Trustee for the benefit of the Certificateholders and designated *"The Bank of New York in trust for registered holders of Alternative Loan Trust 2005-63 Mortgage Pass-Through Certificates, Series 2005-63."* Funds in the Distribution Account shall be held in trust for the Certificateholders for the uses and purposes set forth in this Agreement.

Distribution Account Deposit Date: As to any Distribution Date, 12:30 p.m. Pacific time on the Business Day immediately preceding such Distribution Date.

**Distribution Date:** The 25th day of each calendar month after the initial issuance of the Certificates, or if such 25th day is not a Business Day, the next succeeding Business Day, commencing in November 2005.

Due Date: With respect to a Mortgage Loan, the date on which Scheduled Payments are due on that Mortgage Loan. With respect to any Distribution Date, the related Due Date is the first day of the calendar month in which that Distribution Date occurs.

Eligible Account: Any of (i) an account or accounts maintained with a federal or state chartered depository institution or trust company the short-term unsecured debt obligations of which (or, in the case of a depository institution or trust company that is the principal subsidiary of a holding company, the debt obligations of such holding company) have the highest short-term ratings of Moody's or Fitch and one of the two highest short-term ratings of S&P, if S&P is a Rating Agency at the time any amounts are held on deposit therein, or (ii) an account or accounts in a depository institution or trust company in which such accounts are insured by the FDIC (to the limits established by the FDIC) and the uninsured deposits in which accounts are otherwise secured such that, as evidenced by an Opinion of Counsel delivered to the Trustee and to each Rating Agency, the Certificateholders have a claim with respect to the funds in such account or a perfected first priority security interest against any collateral (which shall be limited to Permitted Investments) securing such funds that is superior to claims of any other depositors or creditors of the depository institution or trust company in which such account is maintained,

| EX-99.1 | **32nd Page of 212** | TOC | 1st | Previous | Next | ↓Bottom | Just 32nd |

(i) Certificates theretofore canceled by the Trustee or delivered to the Trustee for cancellation; and

(ii) Certificates in exchange for which or in lieu of which other Certificates have been executed and delivered by the Trustee pursuant to this Agreement.

Outstanding Mortgage Loan: As of any Due Date, a Mortgage Loan with a Stated Principal Balance greater than zero, which was not the subject of a Principal Prepayment in Full prior to such Due Date and which did not become a Liquidated Mortgage Loan prior to such Due Date.

**Overcollateralized Group:** As defined in Section 4.05.

**Ownership Interest:** As to any Residual Certificate, any ownership interest in such Certificate including any interest in such Certificate as the Holder thereof and any other interest therein, whether direct or indirect, legal or beneficial.

**Park Granada:** Park Granada LLC, a Delaware limited liability company, and its successors and assigns, in its capacity as the seller of the Park Granada Mortgage Loans to the Depositor.

Park Granada Mortgage Loans:  The Mortgage Loans identified as such on the Mortgage Loan Schedule for which Park Granada is the applicable Seller.

**Park Monaco:**  Park Monaco Inc., a Delaware corporation, and its successors and assigns, in its capacity as the seller of the Park Monaco Mortgage Loans to the Depositor.

Park Monaco Mortgage Loans:  The Mortgage Loans identified as such on the Mortgage Loan Schedule for which Park Monaco is the applicable Seller.

**Park Sienna:** Park Sienna LLC, a Delaware limited liability company, and its successors and assigns, in its capacity as the seller of the Park Sienna Mortgage Loans to the Depositor.

Park Sienna Mortgage Loans:  The Mortgage Loans identified as such on the Mortgage Loan Schedule for which Park Sienna is the applicable Seller.

Pass-Through Rate: For any interest-bearing Class of Certificates or Component, the per annum rate set forth or calculated in the manner described in the Preliminary Statement.

Percentage Interest: As to any Certificate, the percentage interest evidenced thereby in distributions required to be made on the related Class, such percentage interest being set forth on the face thereof or equal to the percentage obtained by dividing the Denomination of such Certificate by the aggregate of the Denominations of all Certificates of the same Class.

Periodic Rate Cap: With respect to each Mortgage Loan and any Adjustment Date therefor, the fixed percentage set forth in the related Mortgage Note, which is the maximum amount by which the Mortgage Rate for such Mortgage Loan may increase or decrease (without regard to the Maximum Mortgage Rate or the Minimum Mortgage Rate) on such Adjustment Date from the Mortgage Rate in effect immediately prior to such Adjustment Date.

| **EX-99.1** | **44th Page of 212** | TOC | 1st | Previous | Next | ↓Bottom | Just 44th |

Trust Fund: The corpus of the trust created under this Agreement consisting of (i) the Mortgage Loans and all interest and principal received on or with respect thereto after the Cut-off Date to the extent not applied in computing the Cut-off Date Principal Balance of the Mortgage Loans; (ii) the Certificate Account and the Distribution Account and all amounts deposited therein pursuant to the applicable provisions of this Agreement; (iii) property that secured a Mortgage Loan and has been acquired by foreclosure, deed-in-lieu of foreclosure or otherwise; and (iv) all proceeds of the conversion, voluntary or involuntary, of any of the foregoing.

**Trustee**: The Bank of New York and its successors and, if a successor trustee is appointed under this Agreement, such successor.

Trustee Advance Rate: With respect to any Advance made by the Trustee pursuant to Section 4.01(b), a per annum rate of interest determined as of the date of such Advance equal to the Prime Rate in effect on such date plus 5.00%.

Trustee Fee: As to any Distribution Date, an amount equal to one-twelfth of the Trustee Fee Rate multiplied by the Pool Stated Principal Balance with respect to such Distribution Date.

Trustee Fee Rate: With respect to each Mortgage Loan, 0.009% per annum.

Two Times Test: As to any Distribution Date, if (i) the Aggregate Subordinated Percentage is at least 200% of the Aggregate Subordinated Percentage as of the Closing Date, (ii) the outstanding aggregate Stated Principal Balance of all Mortgage Loans delinquent 60 days or more (averaged over the preceding six month period), as a percentage of the aggregate Class Certificate Balance of the Subordinated Certificates, does not equal or exceed 50% and (iii) the cumulative Realized Losses on all the Mortgage Loans do not exceed (x) with respect to any Distribution Date on or prior to October 2008, 20% of the aggregate Class Certificate Balance of the Subordinated Certificates as of the Closing Date or (y) with respect to any Distribution Date after October 2008, 30% of the aggregate Class Certificate Balance of the Subordinated Certificates as of the Closing Date.

Undercollateralized Group: As defined in Section 4.05.

Underwriters: As specified in the Preliminary Statement.

Underwriter's Exemption: Prohibited Transaction Exemption 2002-41, 67 Fed. Reg. 54487 (2002), as amended (or any successor thereto), or any substantially similar administrative exemption granted by the U.S. Department of Labor.

Voting Rights: The portion of the voting rights of all of the Certificates which is allocated to any Certificate. As of any date of determination, (a) 1% of all Voting Rights shall be allocated to each Class of Notional Amount Certificates, if any (such Voting Rights to be allocated among the holders of Certificates of each such Class in accordance with their respective Percentage Interests), and (b) the remaining Voting Rights (or 100% of the Voting Rights if there is no Class of Notional Amount Certificates) shall be allocated among Holders of the remaining Classes of Certificates in proportion to the Certificate Balances of their respective Certificates on such date.

Case 2:14-cv-01811-SPL   Document 1   Filed 08/14/14   Page 54 of 95

## ARTICLE II
### CONVEYANCE OF MORTGAGE LOANS;
### REPRESENTATIONS AND WARRANTIES

SECTION 2.01.    Conveyance of Mortgage Loans

     (a) Each Seller, concurrently with the execution and delivery of this
Agreement, hereby sells, transfers, assigns, sets over and otherwise conveys
to the Depositor, without recourse, all its respective right, title and
interest in and to the related Mortgage Loans, including all interest and
principal received or receivable by such Seller, on or with respect to the
applicable Mortgage Loans after the Cut-off Date and all interest and
principal payments on the related Mortgage Loans received prior to the Cut-off
Date in respect of installments of interest and principal due thereafter, but
not including payments of principal and interest due and payable on such
Mortgage Loans on or before the Cut-off Date. On or prior to the Closing Date,
Countrywide shall deliver to the Depositor or, at the Depositor's direction,
to the Trustee or other designee of the Depositor, the Mortgage File for each
Mortgage Loan listed in the Mortgage Loan Schedule (except that, in the case
of the Delay Delivery Mortgage Loans (which may include Countrywide Mortgage
Loans, Park Granada Mortgage Loans, Park Monaco Mortgage Loans and Park Sienna
Mortgage Loans), such delivery may take place within thirty (30) days
following the Closing Date). Such delivery of the Mortgage Files shall be made
against payment by the Depositor of the purchase price, previously agreed to
by the Sellers and Depositor, for the Mortgage Loans. With respect to any
Mortgage Loan that does not have a first payment date on or before the Due
Date in the month of the first Distribution Date, Countrywide shall deposit
into the Distribution Account on or before the Distribution Account Deposit
Date relating to the first Distribution Date, an amount equal to one month's
interest at the related Adjusted Mortgage Rate on the Cut-off Date Principal
Balance of such Mortgage Loan.

     (b) Immediately upon the conveyance of the Mortgage Loans referred to in
clause (a), the Depositor sells, transfers, assigns, sets over and otherwise
conveys to the Trustee for the benefit of the Certificateholders, without
recourse, all the right, title and interest of the Depositor in and to the
Trust Fund together with the Depositor's right to require each Seller to cure
any breach of a representation or warranty made in this Agreement by such
Seller or to repurchase or substitute for any affected Mortgage Loan in
accordance herewith.

     (c) In connection with the transfer and assignment set forth in clause
(b) above, the Depositor has delivered or caused to be delivered to the
Trustee within thirty (30) days following the Closing Date for the benefit of
the Certificateholders the following documents or instruments with respect to
each Mortgage Loan so assigned:

               (i) (A) the original Mortgage Note endorsed by manual or
          facsimile signature in blank in the following form: "Pay to the
          order of _____ without recourse," with all intervening
          endorsements showing a complete chain of endorsement from the
          originator to the Person endorsing the Mortgage Note (each such
          endorsement being sufficient to transfer all right, title and
          interest of the party so endorsing, as noteholder or assignee
          thereof, in and to that Mortgage Note); or

31

| **EX-99.1** | **47th Page of 212** | TOC | 1st | Previous | Next | ↓Bottom | Just 47th |

(B) with respect to any Lost Mortgage Note, a lost note affidavit from Countrywide stating that the original Mortgage Note was lost or destroyed, together with a copy of such Mortgage Note;

(ii) except as provided below and for each Mortgage Loan that is not a MERS Mortgage Loan, the original recorded Mortgage or a copy of such Mortgage certified by Countrywide as being a true and complete copy of the Mortgage (or, in the case of a Mortgage for which the related Mortgaged Property is located in the Commonwealth of Puerto Rico, a true copy of the Mortgage certified as such by the applicable notary) and in the case of each MERS Mortgage Loan, the original Mortgage, noting the presence of the MIN of the Mortgage Loans and either language indicating that the Mortgage Loan is a MOM Loan if the Mortgage Loan is a MOM Loan or if the Mortgage Loan was not a MOM Loan at origination, the original Mortgage and the assignment thereof to MERS, with evidence of recording indicated thereon, or a copy of the Mortgage certified by the public recording office in which such Mortgage has been recorded;

(iii) in the case of each Mortgage Loan that is not a MERS Mortgage Loan, a duly executed assignment of the Mortgage (which may be included in a blanket assignment or assignments), together with, except as provided below, all interim recorded assignments of such mortgage (each such assignment, when duly and validly completed, to be in recordable form and sufficient to effect the assignment of and transfer to the assignee thereof, under the Mortgage to which the assignment relates); provided that, if the related Mortgage has not been returned from the applicable public recording office, such assignment of the Mortgage may exclude the information to be provided by the recording office; provided, further, that such assignment of Mortgage need not be delivered in the case of a Mortgage for which the related Mortgaged Property is located in the Commonwealth of Puerto Rico;

(iv) the original or copies of each assumption, modification, written assurance or substitution agreement, if any;

(v) except as provided below, the original or duplicate original lender's title policy or a printout of the electronic equivalent and all riders thereto; and

(vi) in the case of a Cooperative Loan, the originals of the following documents or instruments:

(A) The Coop Shares, together with a stock power in blank;

(B) The executed Security Agreement;

(C) The executed Proprietary Lease;

(D) The executed Recognition Agreement;

32

(E) The executed UCC-1 financing statement with evidence
of recording thereon which have been filed in all places
required to perfect the applicable Seller's interest in the
Coop Shares and the Proprietary Lease; and

(F) The executed UCC-3 financing statements or other
appropriate UCC financing statements required by state law,
evidencing a complete and unbroken line from the mortgagee to
the Trustee with evidence of recording thereon (or in a form
suitable for recordation).

In addition, in connection with the assignment of any MERS Mortgage
Loan, each Seller agrees that it will cause, at the Trustee's expense, the
MERS(R) System to indicate that the Mortgage Loans sold by such Seller to the
Depositor have been assigned by that Seller to the Trustee in accordance with
this Agreement for the benefit of the Certificateholders by including (or
deleting, in the case of Mortgage Loans which are repurchased in accordance
with this Agreement) in such computer files the information required by the
MERS(R) System to identify the series of the Certificates issued in connection
with such Mortgage Loans. Each Seller further agrees that it will not, and
will not permit the Master Servicer to, and the Master Servicer agrees that it
will not, alter the information referenced in this paragraph with respect to
any Mortgage Loan sold by such Seller to the Depositor during the term of this
Agreement unless and until such Mortgage Loan is repurchased in accordance
with the terms of this Agreement.

In the event that in connection with any Mortgage Loan that is not a
MERS Mortgage Loan the Depositor cannot deliver (a) the original recorded
Mortgage, (b) all interim recorded assignments or (c) the lender's title
policy (together with all riders thereto) satisfying the requirements of
clause (ii), (iii) or (v) above, respectively, concurrently with the execution
and delivery of this Agreement because such document or documents have not
been returned from the applicable public recording office in the case of
clause (ii) or (iii) above, or because the title policy has not been delivered
to either the Master Servicer or the Depositor by the applicable title insurer
in the case of clause (v) above, the Depositor shall promptly deliver to the
Trustee, in the case of clause (ii) or (iii) above, such original Mortgage or
such interim assignment, as the case may be, with evidence of recording
indicated thereon upon receipt thereof from the public recording office, or a
copy thereof, certified, if appropriate, by the relevant recording office, but
in no event shall any such delivery of the original Mortgage and each such
interim assignment or a copy thereof, certified, if appropriate, by the
relevant recording office, be made later than one year following the Closing
Date, or, in the case of clause (v) above, no later than 120 days following
the Closing Date; provided, however, in the event the Depositor is unable to
deliver by such date each Mortgage and each such interim assignment by reason
of the fact that any such documents have not been returned by the appropriate
recording office, or, in the case of each such interim assignment, because the
related Mortgage has not been returned by the appropriate recording office,
the Depositor shall deliver such documents to the Trustee as promptly as
possible upon receipt thereof and, in any event, within 720 days following the
Closing Date. The Depositor shall forward or cause to be forwarded to the
Trustee (a) from time to time additional original documents evidencing an
assumption or modification of a Mortgage Loan and (b) any other documents
required to be delivered by the Depositor or the Master Servicer to the
Trustee. In the event that the original Mortgage is not delivered and in
connection with the payment in full of the related Mortgage Loan and the
public recording office requires the presentation of a *"lost instruments*

*affidavit and indemnity*" or any equivalent document, because only a copy of

33

Case 2:14-cv-01811-SPL   Document 1   Filed 08/14/14   Page 58 of 95

the Mortgage can be delivered with the instrument of satisfaction or reconveyance, the Master Servicer shall execute and deliver or cause to be executed and delivered such a document to the public recording office. In the case where a public recording office retains the original recorded Mortgage or in the case where a Mortgage is lost after recordation in a public recording office, Countrywide shall deliver to the Trustee a copy of such Mortgage certified by such public recording office to be a true and complete copy of the original recorded Mortgage.

As promptly as practicable subsequent to such transfer and assignment, and in any event, within thirty (30) days after such transfer and assignment, the Trustee shall (i) as the assignee thereof, affix the following language to each assignment of Mortgage: *"CWALT Series 2005-63, The Bank of New York as trustee"*, (ii) cause such assignment to be in proper form for recording in the appropriate public office for real property records and (iii) cause to be delivered for recording in the appropriate public office for real property records the assignments of the Mortgages to the Trustee, except that, with respect to any assignments of Mortgage as to which the Trustee has not received the information required to prepare such assignment in recordable form, the Trustee's obligation to do so and to deliver the same for such recording shall be as soon as practicable after receipt of such information and in any event within thirty (30) days after receipt thereof and that the Trustee need not cause to be recorded any assignment which relates to a Mortgage Loan (a) the Mortgaged Property and Mortgage File relating to which are located in California or (b) in any other jurisdiction (including Puerto Rico) under the laws of which in the opinion of counsel the recordation of such assignment is not necessary to protect the Trustee's and the Certificateholders' interest in the related Mortgage Loan.

In the case of Mortgage Loans that have been prepaid in full as of the Closing Date, the Depositor, in lieu of delivering the above documents to the Trustee, will deposit in the Certificate Account the portion of such payment that is required to be deposited in the Certificate Account pursuant to Section 3.05 of this Agreement.

Notwithstanding anything to the contrary in this Agreement, within thirty (30) days after the Closing Date with respect to the Mortgage Loans, Countrywide (on its own behalf and on behalf of Park Granada, Park Monaco and Park Sienna) shall either (i) deliver to the Depositor, or at the Depositor's direction, to the Trustee or other designee of the Depositor the Mortgage File as required pursuant to this Section 2.01 for each Delay Delivery Mortgage Loan or (ii) either (A) substitute a Substitute Mortgage Loan for the Delay Delivery Mortgage Loan or (B) repurchase the Delay Delivery Mortgage Loan, which substitution or repurchase shall be accomplished in the manner and subject to the conditions set forth in Section 2.03 (treating each Delay Delivery Mortgage Loan as a Deleted Mortgage Loan for purposes of such Section 2.03); provided, however, that if Countrywide fails to deliver a Mortgage File for any Delay Delivery Mortgage Loan within the thirty (30) day period provided in the prior sentence, Countrywide (on its own behalf and on behalf of Park Granada, Park Monaco and Park Sienna) shall use its best reasonable efforts to effect a substitution, rather than a repurchase of, such Deleted Mortgage Loan and provided further that the cure period provided for in Section 2.02 or in Section 2.03 shall not apply to the initial delivery of the Mortgage File for such Delay Delivery Mortgage Loan, but rather Countrywide (on its own behalf and on behalf of Park Granada, Park Monaco and Park Sienna) shall have five (5) Business Days to cure such failure to deliver. At the end of such thirty (30) day period the Trustee shall send a Delay Delivery Certification for the Delay Delivery Mortgage Loans delivered during such

thirty (30) day period in accordance with the provisions of Section 2.02 of
this Agreement.

34

(d) Neither the Depositor nor the Trust will acquire or hold any Mortgage Loan that would violate the representations made by Countrywide set forth in clause (45) of Schedule III-A hereto.

**SECTION 2.02.    Acceptance by Trustee of the Mortgage Loans.**
              ------------------------------------------

(a) The Trustee acknowledges receipt of the documents identified in the Initial Certification in the form annexed hereto as Exhibit F (an "*Initial Certification*") and declares that it holds and will hold such documents and the other documents delivered to it constituting the Mortgage Files, and that it holds or will hold such other assets as are included in the Trust Fund, in trust for the exclusive use and benefit of all present and future Certificateholders. The Trustee acknowledges that it will maintain possession of the Mortgage Notes in the State of California, unless otherwise permitted by the Rating Agencies.

The Trustee agrees to execute and deliver on the Closing Date to the Depositor, the Master Servicer and Countrywide (on its own behalf and on behalf of Park Granada, Park Monaco and Park Sienna) an Initial Certification in the form annexed to this Agreement as Exhibit F. Based on its review and examination, and only as to the documents identified in such Initial Certification, the Trustee acknowledges that such documents appear regular on their face and relate to the Mortgage Loans. The Trustee shall be under no duty or obligation to inspect, review or examine said documents, instruments, certificates or other papers to determine that the same are genuine, enforceable or appropriate for the represented purpose or that they have actually been recorded in the real estate records or that they are other than what they purport to be on their face.

On or about the thirtieth (30th) day after the Closing Date, the Trustee shall deliver to the Depositor, the Master Servicer and Countrywide (on its own behalf and on behalf of Park Granada, Park Monaco and Park Sienna) a Delay Delivery Certification with respect to the Mortgage Loans in the form annexed hereto as Exhibit G (a "*Delay Delivery Certification*"), with any applicable exceptions noted thereon.

Not later than 90 days after the Closing Date, the Trustee shall deliver to the Depositor, the Master Servicer and Countrywide (on its own behalf and on behalf of Park Granada, Park Monaco and Park Sienna) a Final Certification with respect to the Mortgage Loans in the form annexed hereto as Exhibit H (a "*Final Certification*"), with any applicable exceptions noted thereon.

If, in the course of such review, the Trustee finds any document constituting a part of a Mortgage File that does not meet the requirements of Section 2.01, the Trustee shall list such as an exception in the Final Certification; provided, however that the Trustee shall not make any determination as to whether (i) any endorsement is sufficient to transfer all right, title and interest of the party so endorsing, as noteholder or assignee thereof, in and to that Mortgage Note or (ii) any assignment is in recordable form or is sufficient to effect the assignment of and transfer to the assignee thereof under the mortgage to which the assignment relates. Countrywide (on its own behalf and on behalf of Park Granada, Park Monaco and Park Sienna) shall promptly correct or cure such defect within 90 days from the date it was so notified of such defect and, if Countrywide does not correct or cure such defect within such period, Countrywide (on its own behalf and on behalf of Park Granada, Park Monaco and Park Sienna) shall either (a) substitute

SEC Info - Alternative Loan Trust 2003-63 - 8-K - For 10/28/03 - EX-99.1

(c) The Master Servicer shall, not later than the close of business on the second Business Day immediately preceding each Distribution Date, deliver to the Trustee a report (in form and substance reasonably satisfactory to the Trustee) that indicates (i) the Mortgage Loans with respect to which the Master Servicer has determined that the related Scheduled Payments should be advanced and (ii) the amount of the related Scheduled Payments. The Master Servicer shall deliver to the Trustee on the related Master Servicer Advance Date an Officer's Certificate of a Servicing Officer indicating the amount of any proposed Advance determined by the Master Servicer to be a Nonrecoverable Advance.

### SECTION 4.02. Priorities of Distribution.
-------------------------

(a) (1) With respect to the Available Funds for Loan Group 1, on each Distribution Date, the Trustee shall withdraw such Available Funds from the Distribution Account and apply such funds to distributions on the specified Classes of Group 1 Senior Certificates in the following order and priority and, in each case, to the extent of Available Funds for such Loan Group remaining:

(i) [Reserved];

(ii) concurrently, to each interest-bearing Class of Group 1 Senior Certificates, an amount allocable to interest equal to the related Class Optimal Interest Distribution Amount, any shortfall being allocated among such Classes in proportion to the amount of the Class Optimal Interest Distribution Amount with respect to the Group 1 Certificates that would have been distributed in the absence of such shortfall, provided that prior to an Accrual Termination Date, the related Accrual Amount shall be distributed as provided in Section 4.02(a)(1)(iii);

(iii) [Reserved]; and

(iv) to each Class of Group 1 Senior Certificates, concurrently as follows:

(x) [Reserved]; and

(y) on each Distribution Date, the related Principal Amount, up to the amount of the Senior Principal Distribution Amount for Loan Group 1 for such Distribution Date, sequentially, in the following order of priority:

(1) to the Class A-R Certificates, until its Class Certificate Balance is reduced to zero; and

(2) concurrently, to the Class 1-A-1 and Class 1-A-2 Certificates, pro rata, until their respective Class Certificate Balances are reduced to zero;

(2) With respect to the Available Funds for Loan Group 2, on each Distribution Date, the Trustee shall withdraw such Available Funds from the Distribution Account and apply such funds to distributions on the specified Classes of Group 2 Senior Certificates in the following

61

SEC Info - Alternative Loan Trust 2005-63 - 8-K - For 10/28/05 - EX-99.1

order of priority, and, in each case, to the extent of Available Funds for such Loan Group remaining:

(i) [Reserved];

(ii) concurrently, to each interest-bearing Class of Group 2 Senior Certificates, an amount allocable to interest equal to the related Class Optimal Interest Distribution Amount, any shortfall being allocated among such Classes in proportion to the amount of the Class Optimal Interest Distribution Amount with respect to the Group 2 Certificates that would have been distributed in the absence of such shortfall, provided that prior to an Accrual Termination Date, the related Accrual Amount shall be distributed as provided in Section 4.02(a)(2)(iii);

(iii) [Reserved]; and

(iv) to each Class of Group 2 Senior Certificates, concurrently as follows:

(x) [Reserved]; and

(y) on each Distribution Date, the related Principal Amount, up to the amount of the Senior Principal Distribution Amount for Loan Group 2 for such Distribution Date, concurrently, to the Class 2-A-1 and Class 2-A-2 Certificates, pro rata, until their respective Class Certificate Balances are reduced to zero;

(3) With respect to the Available Funds for Loan Group 3, on each Distribution Date, the Trustee shall withdraw such Available Funds from the Distribution Account and apply such funds to distributions on the specified Classes of Group 3 Senior Certificates in the following order of priority, and, in each case, to the extent of Available Funds for such Loan Group remaining:

(i) [Reserved];

(ii) concurrently, to each interest-bearing Class of Group 3 Senior Certificates, an amount allocable to interest equal to the related Class Optimal Interest Distribution Amount, any shortfall being allocated among such Classes in proportion to the amount of the Class Optimal Interest Distribution Amount with respect to the Group 3 Certificates that would have been distributed in the absence of such shortfall, provided that prior to an Accrual Termination Date, the related Accrual Amount shall be distributed as provided in Section 4.02(a)(3)(iii);

(iii) [Reserved]; and

(iv) to each Class of Group 3 Senior Certificates, concurrently as follows:

(x) [Reserved]; and

(y) on each Distribution Date, the related Principal Amount, up to the amount of the Senior Principal Distribution Amount for Loan

SEC Info - Alternative Loan Trust 2005-63 - 8-K - For 10/28/05 - EX-99.1

Group 3 for such Distribution Date, concurrently, to the Class 3-A-1, Class 3-A-2 and Class 3-A-3 Certificates, pro rata, until their respective Class Certificate Balances are reduced to zero;

(4) With respect to the Available Funds for Loan Group 4, on each Distribution Date, the Trustee shall withdraw such Available Funds from the Distribution Account and apply such funds to distributions on the specified Classes of Group 4 Senior Certificates in the following order of priority, and, in each case, to the extent of Available Funds for such Loan Group remaining:

(i) [Reserved];

(ii) concurrently, to each interest-bearing Class of Group 4 Senior Certificates, an amount allocable to interest equal to the related Class Optimal Interest Distribution Amount, any shortfall being allocated among such Classes in proportion to the amount of the Class Optimal Interest Distribution Amount with respect to the Group 4 Certificates that would have been distributed in the absence of such shortfall, provided that prior to an Accrual Termination Date, the related Accrual Amount shall be distributed as provided in Section 4.02(a)(4)(iii);

(iii) [Reserved]; and

(iv) to each Class of Group 4 Senior Certificates, concurrently as follows:

(x) [Reserved]; and

(y) on each Distribution Date, the related Principal Amount, up to the amount of the Senior Principal Distribution Amount for Loan Group 4 for such Distribution Date, concurrently, to the Class 4-A-1 and Class 4-A-2 Certificates, pro rata, until their respective Class Certificate Balances are reduced to zero;

(5) With respect to the Available Funds for Loan Group 5, on each Distribution Date, the Trustee shall withdraw such Available Funds from the Distribution Account and apply such funds to distributions on the specified Classes of Group 5 Senior Certificates in the following order of priority, and, in each case, to the extent of Available Funds for such Loan Group remaining:

(i) [Reserved];

(ii) concurrently, to each interest-bearing Class of Group 5 Senior Certificates, an amount allocable to interest equal to the related Class Optimal Interest Distribution Amount, any shortfall being allocated among such Classes in proportion to the amount of the Class Optimal Interest Distribution Amount with respect to the Group 5 Certificates that would have been distributed in the absence of such shortfall, provided that prior to an Accrual Termination Date, the related Accrual Amount shall be distributed as provided in Section 4.02(a)(5)(iii);

(iii) [Reserved]; and

63

SEC Info - Alternative Loan Trust 2005-63 - 8-K - For 10/28/05 - EX-99.1

(iv) to each Class of Group 5 Senior Certificates, concurrently as follows:

(x) [Reserved]; and

(y) on each Distribution Date, the related Principal Amount, up to the amount of the Senior Principal Distribution Amount for Loan Group 5 for such Distribution Date, concurrently, to the Class 5-A-1 and Class 5-A-2 Certificates, pro rata, until their respective Class Certificate Balances are reduced to zero;

(6) On each Distribution Date, Available Funds from all Loan Groups remaining after making the distributions described in Section 4.02(a)(1), Section 4.02(a)(2), Section 4(a)(3), Section 4(a)(4) and Section 4(a)(5) will be distributed to the Senior Certificates to the extent of any shortfalls remaining in the amounts to be distributed pursuant to Section 4.05 hereof.

(7) On each Distribution Date, Available Funds from all Loan Groups remaining after making the distributions described in Section 4.02(a)(1), Section 4.02(a)(2), Section 4(a)(3), Section 4(a)(4), Section 4(a)(5) and Section 4(a)(6) above, will be distributed to the Subordinated Certificates and the Class A-R Certificates in the following order and priority and, in each case, to the extent of such funds remaining:

(A) to the Class M Certificates, an amount allocable to interest equal to the Class Optimal Interest Distribution Amount for such Class for such Distribution Date;

(B) to the Class M Certificates, an amount allocable to principal equal to its Pro Rata Share for such Distribution Date until the Class Certificate Balance thereof is reduced to zero;

(C) to the Class B-1 Certificates, an amount allocable to interest equal to the Class Optimal Interest Distribution Amount for such Class for such Distribution Date;

(D) to the Class B-1 Certificates, an amount allocable to principal equal to its Pro Rata Share for such Distribution Date until the Class Certificate Balance thereof is reduced to zero;

(E) to the Class B-2 Certificates, an amount allocable to interest equal to the Class Optimal Interest Distribution Amount for such Class for such Distribution Date;

(F) to the Class B-2 Certificates, an amount allocable to principal equal to its Pro Rata Share for such Distribution Date until the Class Certificate Balance thereof is reduced to zero;

(G) to the Class B-3 Certificates, an amount allocable to interest equal to the Class Optimal Interest Distribution Amount for such Class for such Distribution Date;

64

Case 2:14-cv-01811-SPL   Document 1   Filed 08/14/14   Page 65 of 95

| EX-99.1 | 80th Page of 212 | TOC | 1st | Previous | Next | ↓Bottom | Just 80th |
|---------|------------------|-----|-----|----------|------|---------|-----------|

(H) to the Class B-3 Certificates, an amount allocable to principal equal to its Pro Rata Share for such Distribution Date until the Class Certificate Balance thereof is reduced to zero;

(I) to the Class B-4 Certificates, an amount allocable to interest equal to the Class Optimal Interest Distribution Amount for such Class for such Distribution Date;

(J) to the Class B-4 Certificates, an amount allocable to principal equal to its Pro Rata Share for such Distribution Date until the Class Certificate Balance thereof is reduced to zero;

(K) to the Class B-5 Certificates, an amount allocable to interest equal to the Class Optimal Interest Distribution Amount for such Class for such Distribution Date;

(L) to the Class B-5 Certificates, an amount allocable to principal equal to its Pro Rata Share for such Distribution Date until the Class Certificate Balance thereof is reduced to zero;

(M) [Reserved]; and

(N) to the Class A-R Certificates, any remaining funds in the Trust Fund.

(b) [Reserved].

(c) [Reserved].

(d) On each Distribution Date, the amount referred to in clause (i) of the definition of Class Optimal Interest Distribution Amount for each Class of Certificates for such Distribution Date shall be reduced for each Class of Senior Certificates of a Senior Certificate Group and each Class of Subordinated Certificates by (i) the related Class' pro rata share of Net Prepayment Interest Shortfalls for such Loan Group based (x) with respect to a Class of Senior Certificates on the related Class Optimal Interest Distribution Amount and (y) with respect to any Class of Subordinated Certificates on and prior to the fourth Senior Termination Date on the Assumed Interest Amount or after such Senior Termination Date, the related Class Optimal Interest Distribution Amount for such Distribution Date, without taking into account such Net Prepayment Interest Shortfalls and (ii) (A) the related Class' Allocable Share of the interest portion of the related Debt Service Reduction and (B) each Relief Act Reduction for the Mortgage Loans in the related Loan Group (or after the Senior Credit Support Depletion Date, any Mortgage Loan) incurred during the calendar month preceding the month of such Distribution Date.

(e) Notwithstanding the priority and allocation contained in Section 4.02(a)(7), if, on any Distribution Date, with respect to any Class of Subordinated Certificates, the sum of the related Class Subordination Percentages of such Class and of all Classes of Subordinated Certificates which have a higher numerical Class designation than such Class (the "Applicable Credit

Support Percentage") is less than the Original Applicable Credit Support Percentage for such Class, no distribution of Principal Prepayments will be made to any such Classes (the *"Restricted Classes"*) and the amount of such Principal Prepayments otherwise distributable to the Restricted Classes shall be distributed to any Classes of Subordinated Certificates having lower numerical Class designations than such Class, pro rata, based on their respective Class Certificate Balances immediately prior to such Distribution Date and shall be distributed in the sequential order provided in Section 4.02(a)(7). Notwithstanding anything is this Agreement to the contrary, the Class of Subordinated Certificates then outstanding with the highest distribution priority shall not be a Restricted Class.

(f) If Subsequent Recoveries have been received with respect to a Liquidated Mortgage Loan in a Loan Group, the amount of such Subsequent Recoveries will be applied sequentially, in the order of payment priority, to increase the Class Certificate Balance of each Class of related Certificates to which Realized Losses have been allocated, but in each case by not more than the amount of Realized Losses previously allocated to that Class of Certificates pursuant to Section 4.04 of this Agreement. Holders of such Certificates will not be entitled to any payment in respect of the Class Optimal Interest Distribution Amount on the amount of such increases for any Interest Accrual Period preceding the Distribution Date on which such increase occurs. Any such increases shall be applied pro rata to the Certificate Balance of each Certificate of such Class.

SECTION 4.03. [Reserved].

SECTION 4.04. Allocation of Realized Losses.
----------------------------

(a) On or prior to each Determination Date, the Trustee shall determine the total amount of Realized Losses with respect to the related Distribution Date. For purposes of allocating losses to the Subordinated Certificates, the Class M Certificates will be deemed to have a lower numerical Class designation, and to be of a higher relative payment priority, than each other Class of Subordinated Certificates.

Realized Losses with respect to any Distribution Date shall be allocated as follows:

(i) [Reserved]

(ii) any Realized Loss on the Mortgage Loans in a Loan Group shall be allocated first to the Subordinated Certificates in reverse order of their respective numerical Class designations (beginning with the Class of Subordinated Certificates then outstanding with the highest numerical Class designation) until the respective Class Certificate Balance of each such Class is reduced to zero and second to the Senior Certificates of the related Senior Certificate Group (other than any Notional Amount Certificates), if applicable, pro rata, on the basis of their respective Class Certificate Balances, in each case immediately prior to the related Distribution Date until the respective Class Certificate Balance of each such Class is been reduced to zero; provided, however, that (v) any Realized Losses on the Mortgage Loans in Loan Group 1 otherwise allocable to the Class 1-A-1 Certificates shall be allocated instead to the Class 1-A-2 Certificates until its Class Certificate Balance is reduced to zero, (w) any Realized Losses on the Mortgage Loans in Loan Group 2 otherwise allocable to the Class 2-A-1

## ARTICLE V
## THE CERTIFICATES

### SECTION 5.01. The Certificates.

The Certificates shall be substantially in the forms attached hereto as exhibits. The Certificates shall be issuable in registered form, in the minimum denominations, integral multiples in excess thereof (except that one Certificate in each Class may be issued in a different amount which must be in excess of the applicable minimum denomination) and aggregate denominations per Class set forth in the Preliminary Statement.

Subject to Section 9.02 respecting the final distribution on the Certificates, on each Distribution Date the Trustee shall make distributions to each Certificateholder of record on the preceding Record Date either (x) by wire transfer in immediately available funds to the account of such holder at a bank or other entity having appropriate facilities therefor, if (i) such Holder has so notified the Trustee at least five Business Days prior to the related Record Date and (ii) such Holder shall hold (A) a Notional Amount Certificate, (B) 100% of the Class Certificate Balance of any Class of Certificates or (C) Certificates of any Class with aggregate principal Denominations of not less than $1,000,000 or (y) by check mailed by first class mail to such Certificateholder at the address of such holder appearing in the Certificate Register.

The Certificates shall be executed by manual or facsimile signature on behalf of the Trustee by an authorized officer. Certificates bearing the manual or facsimile signatures of individuals who were, at the time when such signatures were affixed, authorized to sign on behalf of the Trustee shall bind the Trustee, notwithstanding that such individuals or any of them have ceased to be so authorized prior to the countersignature and delivery of such Certificates or did not hold such offices at the date of such Certificate. No Certificate shall be entitled to any benefit under this Agreement, or be valid for any purpose, unless countersigned by the Trustee by manual signature, and such countersignature upon any Certificate shall be conclusive evidence, and the only evidence, that such Certificate has been duly executed and delivered hereunder. All Certificates shall be dated the date of their countersignature. On the Closing Date, the Trustee shall countersign the Certificates to be issued at the direction of the Depositor, or any affiliate of the Depositor.

The Depositor shall provide, or cause to be provided, to the Trustee on a continuous basis, an adequate inventory of Certificates to facilitate transfers.

### SECTION 5.02. Certificate Register; Registration of Transfer and Exchange of Certificates.

(a) The Trustee shall maintain, or cause to be maintained in accordance with the provisions of Section 5.06, a Certificate Register for the Trust Fund in which, subject to the provisions of subsections (b) and (c) below and to such reasonable regulations as it may prescribe, the Trustee shall provide for the registration of Certificates and of transfers and exchanges of Certificates as provided in this Agreement. Upon surrender for registration of transfer of any Certificate, the Trustee shall execute and deliver, in the name of the designated transferee or transferees, one or more new Certificates

Case 2:14-cv-01811-SPL   Document 1   Filed 08/14/14   Page 68 of 95

of the same Class and aggregate Percentage Interest.

74

| **EX-99.1** | **90th Page of 212** | TOC | 1st | Previous | Next | ↓Bottom | Just 90th |

At the option of a Certificateholder, Certificates may be exchanged for other Certificates of the same Class in authorized denominations and evidencing the same aggregate Percentage Interest upon surrender of the Certificates to be exchanged at the office or agency of the Trustee. Whenever any Certificates are so surrendered for exchange, the Trustee shall execute, authenticate, and deliver the Certificates which the Certificateholder making the exchange is entitled to receive. Every Certificate presented or surrendered for registration of transfer or exchange shall be accompanied by a written instrument of transfer in form satisfactory to the Trustee duly executed by the holder thereof or his attorney duly authorized in writing.

No service charge to the Certificateholders shall be made for any registration of transfer or exchange of Certificates, but payment of a sum sufficient to cover any tax or governmental charge that may be imposed in connection with any transfer or exchange of Certificates may be required.

All Certificates surrendered for registration of transfer or exchange shall be cancelled and subsequently destroyed by the Trustee in accordance with the Trustee's customary procedures.

(b) No transfer of a Private Certificate shall be made unless such transfer is made pursuant to an effective registration statement under the Securities Act and any applicable state securities laws or is exempt from the registration requirements under said Act and such state securities laws. In the event that a transfer is to be made in reliance upon an exemption from the Securities Act and such laws, in order to assure compliance with the Securities Act and such laws, the Certificateholder desiring to effect such transfer and such Certificateholder's prospective transferee shall each certify to the Trustee in writing the facts surrounding the transfer in substantially the forms set forth in Exhibit J (the *"Transferor Certificate"*) and (i) deliver a letter in substantially the form of either Exhibit K (the *"Investment Letter"*) or Exhibit L (the *"Rule 144A Letter"*) or (ii) there shall be delivered to the Trustee at the expense of the transferor an Opinion of Counsel that such transfer may be made pursuant to an exemption from the Securities Act. The Depositor shall provide to any Holder of a Private Certificate and any prospective transferee designated by any such Holder, information regarding the related Certificates and the Mortgage Loans and such other information as shall be necessary to satisfy the condition to eligibility set forth in Rule 144A(d)(4) for transfer of any such Certificate without registration thereof under the Securities Act pursuant to the registration exemption provided by Rule 144A. The Trustee and the Master Servicer shall cooperate with the Depositor in providing the Rule 144A information referenced in the preceding sentence, including providing to the Depositor such information regarding the Certificates, the Mortgage Loans and other matters regarding the Trust Fund as the Depositor shall reasonably request to meet its obligation under the preceding sentence. Each Holder of a Private Certificate desiring to effect such transfer shall, and does hereby agree to, indemnify the Trustee and the Depositor, the Sellers and the Master Servicer against any liability that may result if the transfer is not so exempt or is not made in accordance with such federal and state laws.

No transfer of an ERISA-Restricted Certificate shall be made unless the Trustee shall have received either (i) a representation from the transferee of such Certificate acceptable to and in form and substance satisfactory to the Trustee (in the event such Certificate is a Private Certificate, such requirement is satisfied only by the Trustee's receipt of a representation letter from the transferee substantially in the form of Exhibit K or Exhibit L, or in the event such Certificate is a Residual Certificate, such

requirement is satisfied only by the Trustee's receipt of

75

a representation letter from the transferee substantially in the form of
Exhibit I), to the effect that (x) such transferee is not an employee benefit
plan or arrangement subject to Section 406 of ERISA or a plan or arrangement
subject to Section 4975 of the Code, or a person acting on behalf of any such
plan or arrangement or using the assets of any such plan or arrangement to
effect such transfer or (y) in the case of a Certificate that is an
ERISA-Restricted Certificate and that has been the subject of an
ERISA-Qualifying Underwriting, if the purchaser is an insurance company, a
representation that the purchaser is an insurance company which is purchasing
such Certificate with funds contained in an *"insurance company general
account"* (as such term is defined in Section V(e) of Prohibited Transaction
Class Exemption 95-60 (*"PTCE 95-60"*)) and that the purchase and holding of
such Certificate satisfy the requirements for exemptive relief under Sections
I and III of PTCE 95-60 or (ii) in the case of any ERISA-Restricted
Certificate presented for registration in the name of an employee benefit plan
or arrangement subject to ERISA, or a plan or arrangement subject to Section
4975 of the Code (or comparable provisions of any subsequent enactments), or a
trustee or any other person acting on behalf of any such plan or arrangement,
or using such plan's or arrangement's assets, an Opinion of Counsel
satisfactory to the Trustee, which Opinion of Counsel shall not be an expense
of either the Trustee, the Master Servicer or the Trust Fund, addressed to the
Trustee and the Master Servicer, to the effect that the purchase and holding
of such ERISA-Restricted Certificate will not result in a non-exempt
prohibited transaction under Section 406 of ERISA or Section 4975 of the Code,
and will not subject the Trustee or the Master Servicer to any obligation in
addition to those expressly undertaken in this Agreement or to any liability.
For purposes of the preceding sentence, with respect to an ERISA-Restricted
Certificate that is not a Residual Certificate, in the event the
representation letter or Opinion of Counsel referred to in the preceding
sentence is not so furnished, one of the representations in clause (i), as
appropriate, shall be deemed to have been made to the Trustee by the
transferee's (including an initial acquiror's) acceptance of the
ERISA-Restricted Certificate. Notwithstanding anything else to the contrary
herein, any purported transfer of an ERISA-Restricted Certificate to or on
behalf of an employee benefit plan or other plan or arrangement subject to
ERISA or to Section 4975 of the Code without the delivery to the Trustee of an
Opinion of Counsel satisfactory to the Trustee as described above shall be
void and of no effect.

     To the extent permitted under applicable law (including, but not limited
to, ERISA), the Trustee shall be under no liability to any Person for any
registration of transfer of any ERISA-Restricted Certificate that is in fact
not permitted by this Section 5.02(b) or for making any payments due on such
Certificate to the Holder thereof or taking any other action with respect to
such Holder under the provisions of this Agreement so long as the transfer was
registered by the Trustee in accordance with the foregoing requirements.

     (c) Each Person who has or who acquires any Ownership Interest in a
Residual Certificate shall be deemed by the acceptance or acquisition of such
Ownership Interest to have agreed to be bound by the following provisions, and
the rights of each Person acquiring any Ownership Interest in a Residual
Certificate are expressly subject to the following provisions:

     (i) Each Person holding or acquiring any Ownership Interest in a
Residual Certificate shall be a Permitted Transferee and shall promptly
notify the Trustee of any change or impending change in its status as a
Permitted Transferee.

(ii) Except in connection with (i) the registration of the Tax Matters Person Certificate in the name of the Trustee or (ii) any registration in the name of, or transfer of a Residual Certificate to, an affiliate of the Depositor (either directly or through a nominee) in connection with the initial issuance of the Certificates, no Ownership Interest in a Residual Certificate may be registered on the Closing Date or thereafter transferred, and the Trustee shall not register the Transfer of any Residual Certificate unless the Trustee shall have been furnished with an affidavit (a *"Transfer Affidavit"*) of the initial owner or the proposed transferee in the form attached hereto as Exhibit I.

(iii) Each Person holding or acquiring any Ownership Interest in a Residual Certificate shall agree (A) to obtain a Transfer Affidavit from any other Person to whom such Person attempts to Transfer its Ownership Interest in a Residual Certificate, (B) to obtain a Transfer Affidavit from any Person for whom such Person is acting as nominee, trustee or agent in connection with any Transfer of a Residual Certificate and (C) not to Transfer its Ownership Interest in a Residual Certificate or to cause the Transfer of an Ownership Interest in a Residual Certificate to any other Person if it has actual knowledge that such Person is not a Permitted Transferee.

(iv) Any attempted or purported Transfer of any Ownership Interest in a Residual Certificate in violation of the provisions of this Section 5.02(c) shall be absolutely null and void and shall vest no rights in the purported Transferee. If any purported transferee shall become a Holder of a Residual Certificate in violation of the provisions of this Section 5.02(c), then the last preceding Permitted Transferee shall be restored to all rights as Holder thereof retroactive to the date of registration of Transfer of such Residual Certificate. The Trustee shall be under no liability to any Person for any registration of Transfer of a Residual Certificate that is in fact not permitted by Section 5.02(b) and this Section 5.02(c) or for making any payments due on such Certificate to the Holder thereof or taking any other action with respect to such Holder under the provisions of this Agreement so long as the Transfer was registered after receipt of the related Transfer Affidavit, Transferor Certificate and either the Rule 144A Letter or the Investment Letter, if required. The Trustee shall be entitled but not obligated to recover from any Holder of a Residual Certificate that was in fact not a Permitted Transferee at the time it became a Holder or, at such subsequent time as it became other than a Permitted Transferee, all payments made on such Residual Certificate at and after either such time. Any such payments so recovered by the Trustee shall be paid and delivered by the Trustee to the last preceding Permitted Transferee of such Certificate.

(v) The Depositor shall use its best efforts to make available, upon receipt of written request from the Trustee, all information necessary to compute any tax imposed under Section 860E(e) of the Code as a result of a Transfer of an Ownership Interest in a Residual Certificate to any Holder who is not a Permitted Transferee.

The restrictions on Transfers of a Residual Certificate set forth in this Section 5.02(c) shall cease to apply (and the applicable portions of the legend on a Residual Certificate may be deleted) with respect to Transfers occurring after delivery to the Trustee of an Opinion of Counsel, which Opinion of Counsel shall not be an expense of the Trust Fund, the Trustee, the Master Servicer or any Seller, to the effect that the elimination of such restrictions will not cause

| **EX-99.1** | **93rd Page of 212** | TOC | 1st | Previous | Next | ↓Bottom | Just 93rd |

any REMIC hereunder to fail to qualify as a REMIC at any time that the Certificates are outstanding or result in the imposition of any tax on the Trust Fund, a Certificateholder or another Person. Each Person holding or acquiring any Ownership Interest in a Residual Certificate hereby consents to any amendment of this Agreement which, based on an Opinion of Counsel furnished to the Trustee, is reasonably necessary (a) to ensure that the record ownership of, or any beneficial interest in, a Residual Certificate is not transferred, directly or indirectly, to a Person that is not a Permitted Transferee and (b) to provide for a means to compel the Transfer of a Residual Certificate which is held by a Person that is not a Permitted Transferee to a Holder that is a Permitted Transferee.

     (d) The preparation and delivery of all certificates and opinions referred to above in this Section 5.02 in connection with transfer shall be at the expense of the parties to such transfers.

     (e) Except as provided below, the Book-Entry Certificates shall at all times remain registered in the name of the Depository or its nominee and at all times: (i) registration of the Certificates may not be transferred by the Trustee except to another Depository; (ii) the Depository shall maintain book-entry records with respect to the Certificate Owners and with respect to ownership and transfers of such Book-Entry Certificates; (iii) ownership and transfers of registration of the Book-Entry Certificates on the books of the Depository shall be governed by applicable rules established by the Depository; (iv) the Depository may collect its usual and customary fees, charges and expenses from its Depository Participants; (v) the Trustee shall deal with the Depository, Depository Participants and indirect participating firms as representatives of the Certificate Owners of the Book-Entry Certificates for purposes of exercising the rights of holders under this Agreement, and requests and directions for and votes of such representatives shall not be deemed to be inconsistent if they are made with respect to different Certificate Owners; and (vi) the Trustee may rely and shall be fully protected in relying upon information furnished by the Depository with respect to its Depository Participants and furnished by the Depository Participants with respect to indirect participating firms and persons shown on the books of such indirect participating firms as direct or indirect Certificate Owners.

     All transfers by Certificate Owners of Book-Entry Certificates shall be made in accordance with the procedures established by the Depository Participant or brokerage firm representing such Certificate Owner. Each Depository Participant shall only transfer Book-Entry Certificates of Certificate Owners it represents or of brokerage firms for which it acts as agent in accordance with the Depository's normal procedures.

     If (x) (i) the Depository or the Depositor advises the Trustee in writing that the Depository is no longer willing or able to properly discharge its responsibilities as Depository, and (ii) the Trustee or the Depositor is unable to locate a qualified successor or (y) after the occurrence of an Event of Default, Certificate Owners representing at least 51% of the Certificate Balance of the Book-Entry Certificates together advise the Trustee and the Depository through the Depository Participants in writing that the continuation of a book-entry system through the Depository is no longer in the best interests of the Certificate Owners, the Trustee shall notify all Certificate Owners, through the Depository, of the occurrence of any such event and of the availability of definitive, fully-registered Certificates (the *"Definitive Certificates"*) to Certificate Owners requesting the same. Upon surrender to the Trustee of the related Class of Certificates by the Depository, accompanied by the instructions from the Depository for

registration, the Trustee shall issue the Definitive Certificates. Neither the
Master Servicer, the

78

Depositor nor the Trustee shall be liable for any delay in delivery of such instruction and each may conclusively rely on, and shall be protected in relying on, such instructions. The Master Servicer shall provide the Trustee with an adequate inventory of certificates to facilitate the issuance and transfer of Definitive Certificates. Upon the issuance of Definitive Certificates all references in this Agreement to obligations imposed upon or to be performed by the Depository shall be deemed to be imposed upon and performed by the Trustee, to the extent applicable with respect to such Definitive Certificates and the Trustee shall recognize the Holders of the Definitive Certificates as Certificateholders hereunder; provided that the Trustee shall not by virtue of its assumption of such obligations become liable to any party for any act or failure to act of the Depository.

### SECTION 5.03. Mutilated, Destroyed, Lost or Stolen Certificates.

If (a) any mutilated Certificate is surrendered to the Trustee, or the Trustee receives evidence to its satisfaction of the destruction, loss or theft of any Certificate and (b) there is delivered to the Master Servicer and the Trustee such security or indemnity as may be required by them to save each of them harmless, then, in the absence of notice to the Trustee that such Certificate has been acquired by a bona fide purchaser, the Trustee shall execute, countersign and deliver, in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Certificate, a new Certificate of like Class, tenor and Percentage Interest. In connection with the issuance of any new Certificate under this Section 5.03, the Trustee may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the fees and expenses of the Trustee) connected therewith. Any replacement Certificate issued pursuant to this Section 5.03 shall constitute complete and indefeasible evidence of ownership, as if originally issued, whether or not the lost, stolen or destroyed Certificate shall be found at any time.

### SECTION 5.04. Persons Deemed Owners.

The Master Servicer, the Trustee and any agent of the Master Servicer or the Trustee may treat the Person in whose name any Certificate is registered as the owner of such Certificate for the purpose of receiving distributions as provided in this Agreement and for all other purposes whatsoever, and neither the Master Servicer, the Trustee nor any agent of the Master Servicer or the Trustee shall be affected by any notice to the contrary.

### SECTION 5.05.  Access to List of Certificateholders' Names and Addresses.

If three or more Certificateholders and/or Certificate Owners (a) request such information in writing from the Trustee, (b) state that such Certificateholders and/or Certificate Owners desire to communicate with other Certificateholders and/or Certificate Owners with respect to their rights under this Agreement or under the Certificates, and (c) provide a copy of the communication which such Certificateholders and/or Certificate Owners propose to transmit, or if the Depositor or Master Servicer shall request such information in writing from the Trustee, then the Trustee shall, within ten Business Days after the receipt of such request, (x) provide the Depositor, the Master Servicer or such Certificateholders and/or Certificate Owners at such recipients' expense the most recent list of the Certificateholders of such Trust Fund held by the Trustee, if any, and (y) assist the Depositor, the

information delivered to it by the Master Servicer in a Trustee Advance Notice in determining whether it is required to make an Advance under Section 4.01(b), shall have no responsibility to ascertain or confirm any information contained in any Trustee Advance Notice, and shall have no obligation to make any Advance under Section 4.01(b) in the absence of a Trustee Advance Notice or actual knowledge of a Responsible Officer of the Trustee that (A) such Advance was not made by the Master Servicer and (B) such Advance is not a Nonrecoverable Advance.

**SECTION 8.02. Certain Matters Affecting the Trustee.**
--------------------------------------

Except as otherwise provided in Section 8.01 of this Agreement:

(i) the Trustee may request and rely upon and shall be protected in acting or refraining from acting upon any resolution, Officers' Certificate, certificate of auditors or any other certificate, statement, instrument, opinion, report, notice, request, consent, order, appraisal, bond or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties and the Trustee shall have no responsibility to ascertain or confirm the genuineness of any signature of any such party or parties;

(ii) the Trustee may consult with counsel, financial advisers or accountants and the advice of any such counsel, financial advisers or accountants and any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by it hereunder in good faith and in accordance with such Opinion of Counsel;

(iii) the Trustee shall not be liable for any action taken, suffered or omitted by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by this Agreement;

(iv) the Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, bond or other paper or document, unless requested in writing so to do by Holders of Certificates evidencing not less than 25% of the Voting Rights allocated to each Class of Certificates;

(v) the Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents, accountants or attorneys;

(vi) the Trustee shall not be required to risk or expend its own funds or otherwise incur any financial liability in the performance of any of its duties or in the exercise of any of its rights or powers hereunder if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not assured to it;

(vii) the Trustee shall not be liable for any loss on any investment of funds pursuant to this Agreement (other than as issuer of the investment security);

(viii) the Trustee shall not be deemed to have knowledge of an Event of Default until a Responsible Officer of the Trustee shall have received written notice thereof; and

(ix) the Trustee shall be under no obligation to exercise any of the trusts, rights or powers vested in it by this Agreement or to institute, conduct or defend any litigation hereunder or in relation hereto at the request, order or direction of any of the Certificateholders, pursuant to the provisions of this Agreement, unless such Certificateholders shall have offered to the Trustee reasonable security or indemnity satisfactory to the Trustee against the costs, expenses and liabilities which may be incurred therein or thereby.

**SECTION 8.03. Trustee Not Liable for Certificates or Mortgage Loans.**
---------------------------------------------------------

The recitals contained in this Agreement and in the Certificates shall be taken as the statements of the Depositor or a Seller, as the case may be, and the Trustee assumes no responsibility for their correctness. The Trustee makes no representations as to the validity or sufficiency of this Agreement or of the Certificates or of any Mortgage Loan or related document or of MERS or the MERS(R) System other than with respect to the Trustee's execution and counter-signature of the Certificates. The Trustee shall not be accountable for the use or application by the Depositor or the Master Servicer of any funds paid to the Depositor or the Master Servicer in respect of the Mortgage Loans or deposited in or withdrawn from the Certificate Account by the Depositor or the Master Servicer.

**SECTION 8.04. Trustee May Own Certificates.**
----------------------------

The Trustee in its individual or any other capacity may become the owner or pledgee of Certificates with the same rights as it would have if it were not the Trustee.

**SECTION 8.05. Trustee's Fees and Expenses.**
----------------------------

The Trustee, as compensation for its activities hereunder, shall be entitled to withdraw from the Distribution Account on each Distribution Date an amount equal to the Trustee Fee for such Distribution Date. The Trustee and any director, officer, employee or agent of the Trustee shall be indemnified by the Master Servicer and held harmless against any loss, liability or expense (including reasonable attorney's fees and expenses) (i) incurred in connection with any claim or legal action relating to (a) this Agreement, (b) the Certificates or (c) in connection with the performance of any of the Trustee's duties hereunder, other than any loss, liability or expense incurred by reason of willful misfeasance, bad faith or negligence in the performance of any of the Trustee's duties hereunder or incurred by reason of any action of the Trustee taken at the direction of the Certificateholders and (ii) resulting from any error in any tax or information return prepared by the Master Servicer. Such indemnity shall survive the termination of this Agreement or the resignation or removal of the Trustee hereunder. Without limiting the foregoing, the Master Servicer covenants and agrees, except as otherwise agreed upon in writing by the Depositor and the Trustee, and except for any such expense, disbursement or advance as may arise from the Trustee's negligence, bad faith or willful misconduct, to pay or reimburse the Trustee, for all reasonable expenses, disbursements and advances incurred or made by

# EXHIBIT 4

## MERS TERMS AND CONDITIONS

## MERS® System Terms & Conditions

**1.** MERSCORP Holdings, Inc. ("MERSCORP Holdings") and Mortgage Electronic Registration Systems, Inc. ("MERS") (collectively, the "Companies") , and the Member shall abide by these Terms and Conditions ("T&C"), the MERS® System Rules of Membership (the "Rules"), and applicable Procedures (collectively, the "Governing Documents"), copies of which will be supplied upon request. The Governing Documents shall be a part of the terms and conditions of every transaction that the Member may make or have with the Companies or the MERS® System either directly or through a third party. The Member shall be bound by any amendment to any of the Governing Documents

**2.** The Member, at its own expense, shall promptly, or as soon as practicable, cause MERS to appear in the appropriate public records as the mortgagee of record with respect to each mortgage loan that the Member registers on the MERS® System (each, a "MERS Loan"). MERS shall serve as mortgagee of record with respect to all MERS Loans solely as a nominee, in an administrative capacity, for the beneficial owner or owners thereof from time to time. MERS shall have no rights whatsoever to any payments made on account of MERS Loans, to any servicing rights related to MERS Loans, or to any mortgaged properties securing MERS Loans. MERS agrees not to assert any rights (other than rights specified in the Governing Documents) with respect to MERS Loans or mortgaged properties. References herein to "mortgage(s)" and "mortgagee of record" shall include deed(s) of trust and beneficiary under a deed of trust and any other form of security instrument under applicable state law.

**3.** The Companies shall, at all times, comply with the instructions of the holder of mortgage loan promissory notes regarding a MERS Loan. In the absence of contrary instructions from the note holder, the Companies shall comply with instructions from the Servicer shown on the MERS® System in accordance with the Rules and/or applicable Procedures.

**4.** No rights or obligations of the Member with respect to any data or information supplied to the Companies by or on behalf of the Member shall be altered or affected in any manner by the provision of such data or information to the Companies (except as otherwise specifically provided in these T&C or the Rules).

**5.** If the Member uses MERS as Original Mortgagee ("MOM") on the security instrument, the loan must be registered on the MERS® System within 10 days of the Note Date.

**6.** The Companies and the Member agree that: (i) the MERS® System is not a vehicle for creating or transferring beneficial interests in mortgage loans, (ii) transfers of servicing interests reflected on the MERS® System are subject to the consent of the beneficial owner of the mortgage loans, and (iii) MERS® membership or a Member's use of the MERS® System shall not modify or supersede any agreement between or among the Members having interests in mortgage loans registered on the MERS® System.

**7.** If the Member has a third party register loans (the "Registrar") on the MERS® System on behalf of the Member, the Registrar shall not be deemed an agent of MERS or of MERSCORP Holdings. The Registrar shall be solely an agent for the Member, and the Companies are only giving consent to the Member to use a Registrar to enter information on the MERS® System on behalf of the Member. The Member agrees that the Companies are not liable to the Member for any errors and omissions, negligence, breach of confidentiality, breach of the Rules and/or applicable Procedures, or willful misconduct of the Registrar, or any employee, director, officer, agent or affiliate of the Registrar in performing its services to the Member.

1

**8**.  The Member shall promptly pay MERSCORP Holdings the compensation due for transactions registered on the MERS® System and other services rendered to the Member based on the then current MERS® System fee schedules, which may change from time to time. The Member shall promptly pay MERSCORP Holdings any interest and penalties on delinquent fee payments at the rate set by MERSCORP Holdings from time to time. MERSCORP Holdings shall have the authority to impose reasonable penalties and fines on Members for breach of the Governing Documents, and the Member shall promptly pay such fines in accordance with the terms of their imposition.

**9**.  The Companies shall indemnify and hold harmless the Member, and any employee, director, officer, agent or affiliate of the Member (a "Member Party"), from and against any and all third-party claims, losses, penalties, fines, forfeitures, reasonable attorney fees and related costs, judgments, and any other costs, fees and expenses ("Indemnified Payments") that the Member Party may sustain directly from the negligence, errors and omissions, breach of confidentiality, breach of the Governing Documents, or willful misconduct of the Companies, or any employee, director, officer, agent or affiliate of the Companies (a "MERSCORP Holdings/MERS Indemnified Claim"). Notwithstanding the foregoing, the Companies shall not be liable or responsible under the terms of this Paragraph for any losses or claims resulting from the actions or omissions of any person other than an employee, director, officer, agent or affiliate of the Companies.

The Member shall indemnify and hold harmless the Companies, and any employee, director, officer, agent or affiliate of the Companies (each, a "MERSCORP Holdings/MERS Party"), for any Indemnified Payments which do not result from a MERSCORP Holdings/MERS Indemnified Claim and which such MERSCORP Holdings/MERS Party incurs (i) from the negligence, errors and omissions, breach of confidentiality, breach of the Governing Documents, or willful misconduct of a Member Party, (ii) with respect to a transaction on the MERS® System initiated by such Member, or (iii) as a result of compliance by the Companies with instructions given by the Member, or its designee, as beneficial owner, servicer or secured party shown on the MERS® System (a "Member Indemnified Claim").

The Companies shall promptly notify the Member if a claim is made by a third party against either the Companies or the Member with respect to any MERS Loan in which the Member is shown on the MERS® System as beneficial owner, servicer or secured party in accordance with the Rules and/or applicable Procedures. The Member shall promptly notify the Companies if a claim is made against the Member that may be subject to the indemnification provisions of this Paragraph.

The obligations of the Companies and the Member under this Paragraph shall survive the termination of the Member's use of the MERS® System and the Member's MERS® membership.

**10**.  The Companies and the Member shall maintain appropriate insurance coverage that shall include an errors and omissions insurance policy, as well as a fidelity bond. The Companies shall not be required to maintain coverage for persons who may be appointed at the request of the Member as MERS Signing Officers. The Member's policies shall protect and insure the Companies against losses in connection with the release or satisfaction of a mortgage loan without having obtained payment in full of the indebtedness secured thereby. Upon request, the Companies or the Member shall cause to be delivered to the other a certified true copy of such errors and omissions insurance policy and fidelity bond.

In the event of any loss of principal or interest on a mortgage loan or any Indemnified Payments for which reimbursement is received from a fidelity bond or any errors and omissions insurance policy or other insurance policy, the proceeds from any such bond or insurance shall be held in trust for and be promptly paid to the Member who is shown as the servicer on the MERS® System on behalf of the beneficial owner unless otherwise requested by the beneficial owner.

2

**11.** Any notice or other communication which is required or permitted to be given or made to the Companies pursuant to any provision of the Governing Documents shall be given or made in writing, and shall be sent by nationally recognized overnight courier or facsimile, followed by delivery of the original via first class mail, addressed as follows: MERSCORP Holdings, Inc., Corporate Secretary, 1818 Library Street, Suite 300, Reston, VA 20190

**12.** These T&C and all transactions effected by the Member with the Companies shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia without regard to its choice of law provisions.

**13.** Neither the Member nor the Companies shall institute a proceeding before any tribunal to resolve any controversy or claim arising out of or relating to the Governing Documents, or the breach, termination or invalidity thereof (a "Dispute), before such party has sought to resolve the Dispute through direct negotiation with the other party. If the Dispute is not resolved within thirty (30) days after a written demand for direct negotiation, the parties shall attempt to resolve the Dispute through mediation. If the parties do not promptly agree on a mediator, either party may request the then chief judge of the Circuit Court of Fairfax County, Virginia to appoint a mediator. All mediation proceedings hereunder shall be held in Washington, D.C. If the mediator is unable to facilitate a settlement of the Dispute within a reasonable period of time, as determined by the mediator, the mediator shall issue a written statement to the parties to that effect, and the aggrieved party may then seek relief in accordance with the arbitration provisions of this Paragraph. The fees and expenses of the mediator shall be paid by the party initiating the Dispute.

In the event that the Member and the Companies are not able to resolve a Dispute in accordance with the mediation provisions of this Paragraph, such Dispute shall be settled by binding arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof; provided, however, that the place of arbitration shall be Washington, DC, and fees and expenses for the arbitration proceedings shall be paid by the party initiating arbitration.

**1**MERSCORP Holdings is the service provider for MERS.
**2**MERS Loans also include any mortgage loan that is shown to be registered to the Member on the MERS® System.

# EXHIBIT 5

**MERS ASSIGNMENT, DATED 3/05/12**

OFFICIAL RECORDS OF
PINAL COUNTY RECORDER
LAURA DEAN-LYTLE

DATE/TIME: 03/08/2012 0914
FEE:                  $9.00
PAGES:                1
FEE NUMBER:    2012-018795

Recording Requested By:
**Bank of America**
Prepared By: Aida Duenas
**888-603-9011**
When recorded mail to:
CoreLogic
450 E. Boundary St.
Attn: Release Dept.
Chapin, SC 29036

DocID#   75710460454519485
Property Address:
**33276 N Cherry Creek Rd**
**Queen Creek, AZ 85142-4738**
AZ0-ADT 17503723      3/5/2012

This space for Recorder's use

MIN #: 100039610008644956      MERS Phone #:   888-679-6377

## ASSIGNMENT OF DEED OF TRUST

For Value Received, the undersigned holder of a Deed of Trust (herein "Assignor") whose address is 1901 E
Voorhees Street, Suite C, Danville, IL 61834 does hereby grant, sell, assign, transfer and convey unto THE
BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK,AS TRUSTEE FOR THE
CERTIFICATEHOLDERS OF CWALT, INC., ALTERNATIVE LOAN TRUST   2005-63, MORTGAGE
PASS-THROUGH CERTIFICATES, SERIES 2005-63 whose address is 101 BARCLAY ST - 4W, NEW
YORK, NY 10286
all beneficial interest under that certain Deed of Trust described below together with the note(s) and obligations
therein described and the money due and to become due thereon with interest and all rights accrued or to accrue
under said Deed of Trust.

Original Lender:        E-LOAN, INC.
Borrower(s):            WENDLE V LEHNERD AND BARBARA A. LEHNERD, HUSBAND AND WIFE,
                        AS COMMUNITY PROPERTY WITH RIGHT OF SURVIVORSHIP
Original Trustee:       LENDERS FIRST CHOICE
Date of Deed of Trust: 7/23/2005      Original Loan Amount: $264,000.00

Recorded in Pinal County, AZ on: 8/17/2005, book N/A, page N/A and instrument number 2005-106107

IN WITNESS WHEREOF, the undersigned has caused this Assignment of Deed of Trust to be executed on
___MAR 0 5 2012___

MORTGAGE ELECTRONIC REGISTRATION
SYSTEMS, INC.

By: _____
~~Beverly Brooks Assistant Secretary~~

State of California
County of Ventura

On  MAR 0 5 2012   before me,   Barbara J. Gibbs _____, Notary Public, personally
appeared   Beverly Brooks _____, who proved to me on the basis of satisfactory evidence to be
the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they
executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument
the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

**I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.**

WITNESS my hand and official seal.

_____
Notary Public   Barbara J. Gibbs
My Commission Expires: September 9, 2013

BARBARA J. GIBBS
Commission # 1864186
Notary Public - California
Los Angeles County
My Comm. Expires Sep 9, 2013

# EXHIBIT 6

**SUBSTITUTION OF TRUSTEE, DATED 3/26/12**

OFFICIAL RECORDS OF
PINAL COUNTY RECORDER
LAURA DEAN-LYTLE

**RECORDING REQUESTED BY:**
RECONTRUST COMPANY, N.A.
2380 Performance Dr, TX2-984-04-07
Richardson, TX  75082
**WHEN RECORDED MAIL TO:**
 BANK OF AMERICA, N.A.
 400 National Way
 SIMI VALLEY, CA  93065
 Attn: FORECLOSURE DEPT
TS No.  12-0025609
Title Order No. 120105122AZGTI
APN No.  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

DATE/TIME: 03/27/2012 1420

| | |
|---|---|
| FEE: | $9.00 |
| PAGES: | 2 |
| FEE NUMBER: | 2012-024665 |

## SUBSTITUTION OF TRUSTEE ARIZONA

The undersigned beneficiary hereby appoints RECONTRUST COMPANY, N.A. 2380 Performance Dr,
TX2-984-04-07 Richardson, TX  75082, SUCCESSOR TRUSTEE under the deed of trust executed by
WENDLE V LEHNERD AND BARBARA A. LEHNERD, HUSBAND AND WIFE, AS
COMMUNITY PROPERTY WITH RIGHT OF SURVIVORSHIP, as trustor(s), in which
MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., is named beneficiary, and
LENDERS FIRST CHOICE, as original trustee, and Recorded on 08/17/2005, in Pinal County;
Arizona, as Instrument Number 2005-106187, Book N/A, Page N/A, and legally describing the trust
property as

SEE ATTACHED EXHIBIT A - LEGAL DESCRIPTION

RECONTRUST COMPANY, N.A. HAS BEEN APPOINTED AS SUCCESSOR TRUSTEE.
RECONTRUST COMPANY, N.A. QUALIFIES AS A TRUSTEE OF THE TRUST DEED UNDER
ARIZONA REVISED STATUTES SECTION 33-803, SUBSECTION A. 5., BECAUSE IT IS A
NATIONAL ASSOCIATION REGULATED BY THE OFFICE OF THE COMPTROLLER OF THE
CURRENCY("OCC")

DATED: 03/26/2012

THE BANK OF NEW YORK MELLON FKA THE BANK
OF NEW YORK, AS TRUSTEE FOR THE
CERTIFICATEHOLDERS OF CWALT, INC.,
ALTERNATIVE LOAN TRUST 2005-63, MORTGAGE
PASS THROUGH CERTIFICATES, SERIES 2005-63, BY
ITS AIF BANK OF AMERICA, N.A. SUCCESSOR BY
MERGER TO BAC HOME LOANS SERVICING, LP

Stephanie Y. King    AVP

State of: _____Texas_____ )
County of: _____Tarrant_____ )
On ___MAR 2 6 2012___ before me, ___Rosemarie S. Martinez_____, personally appeared
___Stephanie Y. King___ AVP _____, know to me (or proved to me on the oath of
_____ or through _____) to be the person whose name is subscribed to the
foregoing instrument and acknowledged to me that he/she executed the same for the purposes and
consideration therein expressed.
Witness my hand and official seal.

NOTARY PUBLIC

ROSEMARIE S MARTINEZ
Notary Public
STATE OF TEXAS
My Comm. Exp. 08-21-16

*Form azsub_2011.11.0_11/2011*

# EXHIBIT 7

**SUBSTITUTION OF TRUSTEE, DATED 5/08/14**



**OFFICIAL RECORDS OF
PINAL COUNTY RECORDER
VIRGINIA ROSS**

RECORDING REQUESTED BY:
ServiceLink

| | |
|---|---|
| DATE/TIME: | 05/15/2014 1347 |
| FEE: | $9.00 |
| PAGES: | 1 |
| FEE NUMBER: | 2014-028210 |

AND WHEN RECORDED MAIL TO:
Law Offices of Les Zieve
30 Corporate Park, Suite #450
Irvine, California 92606



TS No.: 13-23965

## SUBSTITUTION OF TRUSTEE

**WHEREAS, WENDLE V. LEHNERD AND BARBARA A. LEHNERD, HUSBAND AND WIFE,
AS COMMUNITY PROPERTY WITH RIGHT OF SURVIVORSHIP** was the original Trustor, **LENDERS
FIRST CHOICE** was the original Trustee, and **E-LOAN, INC., as Lender, Mortgage Electronic Registration
Systems, Inc.** was the original Beneficiary under that certain Deed of Trust dated 7/23/2005 and recorded on
8/17/2005, as Instrument Number 2005-106107 of Official Records of Pinal County, Arizona; and

**WHEREAS,** the undersigned is the present Beneficiary under said Deed of Trust, and

**WHEREAS,** the undersigned desires to substitute a new Trustee under said Deed of Trust in place and
instead of said original Trustee, or Successor Trustee, thereunder, in the manner in said Deed of Trust provided,

**NOW, THEREFORE,** the undersigned hereby substitutes **James F. Murphy, a member of the State Bar
of Arizona, 40 N. Central Avenue, Suite 1400, Phoenix AZ 85004** as Trustee under said Deed of Trust.
Whenever the context hereof so requires, the masculine gender includes the feminine and/or neuter, and the singular
number includes the plural.

Dated: **5/8/14**

THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW
YORK, AS TRUSTEE FOR THE CERTIFICATEHOLDERS OF
CWALT, INC., ALTERNATIVE LOAN TRUST 2005-63,
MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2005-63,
By Bayview Loan Servicing, LLC, its attorney in fact

_Margaret Kwiatanowski_

**Margaret Kwiatanowski        Assistant Vice President**

STATE OF **Pennsylvania**

COUNTY OF **Montgomery**

The foregoing instrument was acknowledged before me _Dara Foye_ this _8th_ day of _May_
20**14**, by _Margaret Kwiatanowski_ .

(NOTARY SEAL) _Dara Foye_        (Signature of Notary Public-State of **Pennsylvania**)

**Dara Foye**

(Name of Notary Typed, Printed, or Stamped)

Personally Known _____ OR Produced Identification _____ Type of Identification
Produced_____

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Dara Foye, Notary Public
Upper Dublin Twp., Montgomery County
My Commission Expires Jan. 17, 2017
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES



# EXHIBIT 8

**NOTICE OF TRUSTEE SALE, DATED 5/14/14**



**OFFICIAL RECORDS OF
PINAL COUNTY RECORDER
VIRGINIA ROSS**

Recording Requested by:

When Recorded Mail to:
Law Offices of Les Zieve
40 N. Central Avenue, Suite 1400
Phoenix AZ 85004

| | |
|---|---|
| DATE/TIME: | 05/15/2014 1347 |
| FEE: | $9.00 |
| PAGES: | 2 |
| FEE NUMBER: | 2014-028211 |



SPACE ABOVE THIS LINE FOR RECORDERS USE

TS#: 13-23965   Order #: 1576560

# NOTICE OF TRUSTEE'S SALE

The following legally described trust property will be sold, pursuant to the power of sale under that certain Deed of Trust dated 7/23/2005 and recorded on 8/17/2005, as Instrument No. 2005-106107, in the office of the County Recorder of Pinal County, Arizona, at public auction to the highest bidder at the main entrance to the Superior Court Building, 971 North Jason Lopez Circle Building A, Florence, AZ, on 8/19/2014 at 11:00 AM of said day:

**LOT 104, OF THE VILLAGE AT SAN TAN HEIGHTS PARCEL 5, ACCORDING TO THE PLAT OF RECORD IN THE OFFICE OF THE COUNTY RECORDER OF PINAL COUNTY, ARIZONA, RECORDED IN CABINET D, SLIDE 48.**

Per A.R.S. Section 33-803 (A)(2) the successor trustee appointed here qualifies as a Trustee of the trust deed in the Trustee's capacity as a member of the State Bar of Arizona.

ACCORDING TO THE DEED OF TRUST OR UPON INFORMATION SUPPLIED BY THE BENEFICIARY, THE FOLLOWING INFORMATION IS PROVIDED PURSUANT TO A.R.S. SECTION 33-808(C):

Street address or identifiable location:        **33276 N. CHERRY CREEK ROAD
                                                 QUEEN CREEK, AZ 85242**

A.P.N.: **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 1**

Original Principal Balance: **$264,000.00**

Name and address of original trustor:
(as shown on the Deed of Trust)
**WENDLE V. LEHNERD AND BARBARA A. LEHNERD, HUSBAND AND WIFE, AS COMMUNITY PROPERTY WITH RIGHT OF SURVIVORSHIP
33276 N. CHERRY CREEK ROAD
QUEEN CREEK, AZ 85242**

Name and address of beneficiary:
(as of recording of Notice of Sale)
**THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK, AS TRUSTEE FOR THE CERTIFICATEHOLDERS OF CWALT, INC., ALTERNATIVE LOAN TRUST 2005-63, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2005-63
4425 Ponce De Leon Blvd.
5th Floor
Coral Gables, FL 33146**

1



# NOTICE OF TRUSTEE'S SALE

**NAME, ADDRESS & TELEPHONE NUMBER OF TRUSTEE:**
(as of recording of Notice of Sale)

James F. Murphy, a member of the State Bar of Arizona
Law Offices of Les Zieve
30 Corporate Park, Suite #450
Irvine, California 92606
Phone Number: (714) 848-7920

**SALE INFORMATION:**
Sales Line: (714) 573-1965 or
Website: www.priorityposting.com

Dated: ___May 14, 2014___

James F. Murphy, a member of the State Bar of Arizona

Per A.R.S. Section 33-803 (A)(2) the successor trustee appointed here qualifies as a Trustee of the trust deed in the Trustee's capacity as a member of the State Bar of Arizona.

State of Arizona          )
                          ) ss.
County of Maricopa        )

On ___May 14, 2014___, before me, Paula D. Hillock, a Notary Public for the State of Arizona, personally appeared James F. Murphy, a member of the State Bar of Arizona, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

Notary Public

PAULA D. HILLOCK
NOTARY PUBLIC - ARIZONA
MARICOPA COUNTY
My Commission Expires
August 5, 2017

2

# EXHIBIT 9

## MAXIMS OF LAW

## Maxims of Law

a. An un-rebutted affidavit is a judgment in commerce.

b. In commerce, truth is sovereign.

c. Truth is expressed in the form of an affidavit.

d. A lien or claim can be satisfied only through rebuttal by counter-affidavit point-for-point, resolution by jury, or payment.

e. The proof lies on him who affirms, not on him who denies.

f. The agreement of the parties makes the law of contract.

g. A man's word is his bond.

h. For truth to be established, it must be expressed.

i. Silence is agreement.

j. He who leaves the battlefield first loses by default.

k. When a party has a duty to speak, his silence equates with fraud.

l. An accessory follows the nature of his principal.

m. A contract founded on a base or unlawful consideration, or against good morals, is null.

n. Sacrifice is the measure of credibility. One who has not been damaged by, given to, lost on account of, or put at risk by another has no basis to make claims or charges against him.

# EXHIBIT 10

**RECORDED NOTICE OF DEFAULT/
AFFIDAVIT OF TRUTH, 8/12/13**



**OFFICIAL RECORDS OF**
**PINAL COUNTY RECORDER**
**VIRGINIA ROSS**

Prepared by and after recording return to:  )
                                  )

| | |
|---|---|
| DATE/TIME: | 08/12/2013 1640 |
| FEE: | $9.00 |
| PAGES: | 2 |
| FEE NUMBER: | 2013-066517 |

Name:     Wendle V. Lehnerd      )
Address:   33276 N. Cherry Creek Rd.  )
Address 2:  Queen Creek, AZ  85142    )
Phone:    602-295-6175          )
                                    )
                                    )----**Above This Line Reserved For Official Use Only**----

# NOTICE OF DEFAULT
## AFFIDAVIT OF TRUTH

**BANK:**                                                     **HOMEOWNER:**

     BANK OF NEW YORK MELLON                      Wendle V. Lehnerd
     One Wall Street
     New York, NY 10286

**MERS ID Number:** 100039610008644956

**Property Address:**  33276 N. Cherry Creek Rd., Queen Creek, AZ 85142

**Legal Description:**  THE VILLAGE AT SANTAN HEIGHTS PARCEL 5 LOT 104, SEC 12-3S-7E, 6601 SQ. FT 0.15AC, ACCORDING TO THE PLAT OF RECORD IN THE OFFICE OF THE COUNTY RECORDER OF PINAL COUNTY, ARIZONA, RECORDED IN CABINET D, SLIDE 48.  PINAL COUNTY PARCEL #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.
Commonly known as: 33276 N. Cherry Creek Rd., Queen Creek, AZ 85142

**I, Wendle V. Lehnerd, under penalty of perjury declare the following:**  BANK OF NEW YORK MELLON, hereinafter, **BANK,** has defaulted on its claim of ownership and right to enforce the Promissory Note, Deed of Trust, security instrument recorded on August 17, 2005 in the Office of the County Recorder of Pinal County, State of Arizona, as instrument number 2005-106107.

**BANK** was unable to verify and produce proof of claim by responding completely to the PROOF OF CLAIM REQUEST they received on **July 11, 2013** by USPS Certified Mail, as evidenced by signed Return Receipts, within **30 days,** and therefore cannot be a party to enforce the security instrument pursuant to federal and state law.

1) Pursuant to USC Title 18, Part 1, Chapter 101 § 2071 and UCC 3-501(b)(2)(1), Homeowner is entitled to verify through visual inspection of, "THE ORIGINAL WET INK SIGNATURE PROMISSORY NOTE" and ALL ASSIGNMENTS, made available for viewing in PINAL COUNTY, ARIZONA.

<strong>BANK</strong> failed to comply

1

2) **BANK** was requested to provide "THE ACCOUNT AND GENERAL LEDGER STATEMENT", showing the full accounting of the alleged obligation they were attempting to collect thereby proving existence of a debt.

<strong>BANK</strong> failed to comply

**3) BANK** was requested to provide a "WRITTEN AFFIDAVIT UNDER PENALTY OF PERJURY" from someone who had firsthand knowledge of the facts that could stipulate the following: (a) The debt is valid and no discharge has occurred; (b) No tax credit was received for the discharge (if any) of the debt; (c) The debt has not been satisfied; (d) That your bank or client is the real party of interest.

<strong>BANK</strong> failed to comply

The BANK was unable to provide proof of claim as a real party of interest and cannot rightfully enforce their claim under U.C.C. - ARTICLE 3 § 3-301. They have entered an Administrative Default and a Breach of Contract resulting in agreement between the parties that the BANK has no claim of rights, title or interest in said property; and in the matter of the alleged loan, performance is satisfied and the account is settled in full. BANK has entered a NO CONTEST.

This is **LEGAL NOTICE** to all Banks, Law Firms, Trustees and Title Companies. All future collection action without the required verification / evidence shall constitute extortion, theft and fraud which are Federal felonies punishable by prison time and civil action 3X damages.

I assert under penalty of perjury that this notice is not recorded for the purpose of slandering title to real property. I am informed and believe that the information contained herein is true.

By: _Wendle V. Lehnerd_____        Date: ___8/12/2013_____

Wendle V. Lehnerd        All Rights Reserved
33276 N. Cherry Creek Rd.
Queen Creek, AZ  85142

JURAT

STATE OF ARIZONA          )

                          )    ss

COUNTY OF PINAL           )

This instrument was acknowledged before me the _12_ day of _August_____, 2013.

By: _Wendle V. Lehnerd_

_____
NOTARY PUBLIC                        SE...

SHAWNNA L. GEREG
Notary Public - State of Arizona
PINAL COUNTY
My Commission Expires
June 4, 2017

2